UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS                04-CV-12033-PBS
In the matter of the application of
**CHARLES RAMPINO**
for a WRIT OF HABEAS CORPUS

### TREATISE ON PROTECTED LIBERTY INTEREST
### UNDER THE DUE PROCESS CLAUSE

    Charles Rampino, the petitioner in the above-entitled matter hereby submitts for the convenience of this Court and the Attorney General's Office, a reproduced copy of (2) TREATISE, who's main focus is on PROTECTED LIBERTY INTEREST UNDER THE DUE PROCESS CLAUSE. It is in the petitioner's belief, that these TREATISE will aid in deciding the issues in the case at bar.

Respectfully submiited,

CHARLES RAMPINO PRO SE
OLD COLONY CORR. CTR.
1 ADMINISTRATION ROAD
BRIDGEWATER, MA. 02324

DATED 10-29-04

## TABLE OF CONTENTS

1. CRIMINAL AND CIVIL CONFINEMENT    (1991)        1-14

2. RIGHTS OF PRISONERS 3RD EDITION   (2001)        15-34

3. 120 CMR 100.00 DEFINITIONS        (2002)
   "MAXIMUM TERM OF SENTENCE"                       36

# Kentucky Department of Corrections v. Thompson: The Demise of Protected Liberty Interests Under the Due Process Clause

## I. Introduction

One of the basic guarantees of the fourteenth amendment of the United States Constitution is the proposition that no state may "deprive any person of life, liberty or property, without due process of law."[1] Despite this seemingly simple proposition, the definitions of life, liberty and property, and the protections to be afforded them, have been subject to continuing interpretation. Recently, the concept tion and clarification.[2] Prisoners, unlike ordinary citizens, are afforded only limited constitutional protections under the due process clause.[3] They do, however, retain a significant "residuum of constitutionally protected liberty."[4] It is the source and definition of these liberties that the Supreme Court addressed once again in *Kentucky Department of Corrections v. Thompson.*[5]

In determining the existence of a liberty interest, the Court in *Thompson* applied the so-called "positivist" or "entitlement" theory[6] of due process analysis. This theory was originally created in defining property interests under the due process clause and was later used in defining liberty interests in prisoners' rights cases.[7] Under the entitlement theory, the Court first looks to the Constitution itself and then to the content of state law to determine whether an individual possesses a

---

1. U.S. CONST. amend. XIV, § 1. "[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ." *Id.*

2. *See* Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904 (1989).

3. *See* Meachum v. Fano, 427 U.S. 215 (1976), which states: "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Id.* at 224. *See also* Vitek v. Jones, 445 U.S. 480 (1980); Bell v. Wolfish, 441 U.S. 520 (1979).

4. *Thompson*, 109 S. Ct. at 1911 (Marshall, J., dissenting).

5. 109 S. Ct. 1904 (1989).

6. Herman, *The New Liberty: The Procedural Due Process Rights of Prisoners and Others Under the Burger Court*, 59 N.Y.U. L. REV. 482, 484 (1984). Although this doctrine is known as both the positivist and the entitlement theory, this Comment will refer to it as the entitlement theory.

7. *Id.* at 503-04.

liberty interest under the due process clause.[8]

In applying this analysis, the Court in *Thompson* held that the existence of a protected liberty interest in a prison context does not depend on the significance or relative importance of the interest at issue, but upon close examination of the relevant state statutes and regulations.[9] The content of state statutes and regulations may create a protected liberty interest under the due process clause[10] by using "'explicitly mandatory language,' in connection with the establishment of 'specific substantive predicates' to limit [official] discretion."[11]

In the *Thompson* case, the Court predicates the existence of almost all liberty interests in a prison context to a subjective analysis of statutory construction which, for the most part, is a question of semantics. This Case Comment will address the development of protected liberty interests under the due process clause and the current state of the law in light of the Court's decision in *Thompson*. It will also discuss the possible consequences of the Court's analysis on the creation and denial of protected liberty interests which may result from the judgments of the Supreme Court and state legislatures. Finally, this Comment will address whether the Court's approach is appropriate given the logical underpinnings of the entitlement theory of due process analysis.

II. FACTS

In 1976 an action was brought under 42 U.S.C. § 1983 by a number of prisoners at the Kentucky State Penitentiary at Eddyville. The prisoners alleged that the conditions of confinement constituted cruel and unusual punishment in violation of the eighth amendment of the United States Constitution.[12] A consent decree was entered in that case, encompassing almost every aspect of prison life.[13] The consent decree also addressed visitation privileges which were to be established

---

8. *Thompson*, 109 S. Ct. at 1909; Hewitt v. Helms, 459 U.S. 460, 469 (1983).
9. *Thompson*, 109 S. Ct. at 1909.
10. *Id.* at 1910.
11. *Id.* (quoting Hewitt v. Helms, 459 U.S. 460, 472 (1983)).
12. Kendrick v. Bland, 541 F. Supp. 21, 22 (W.D. Ky. 1981). The original lawsuit was based on the fact that the cellhouses at the Kentucky State Penitentiary were constructed in the 1880's and had not been renovated in 100 years. *Id.* at 23. There was also a pattern of guards harassing inmates, abuse of the informant system, misclassification of inmates causing brutality toward mentally impaired inmates, and abnormally high homicide and suicide rates in the prison. *Id.* at 23-26. In the original case, the prisoners made no claim of any fourteenth amendment due process violations. *Id.* at 22.
13. *Id.* The consent decree covered almost all aspects of inmate life, including the following: population, housing, classification of inmates, programs for inmates, food services, disciplinary procedures, segregation of inmates, court access, mail, recreation and exercise, religion, visitation, parole and staffing. *Id.* at 27-40.



and maintained at the Kentucky State Reformatory at LaGrange.[14] The consent decree stated in part that: "[t]he Bureau of Corrections encourages and agrees to maintain visitation at least at the current level with minimal restrictions," and to "continue . . . [an] open visitation policy . . . ."[15] In accordance with the consent decree, the Commonwealth of Kentucky adopted additional visitation regulations which allowed prisoners to receive three separate visits per week.[16] They also provided a non-exhaustive list of specific instances under which visitation privileges could be denied and visitors excluded.[17]

The *Thompson* case itself arose from two incidents at the Kentucky State Reformatory.[18] In the first incident, for six months, an inmate named Kenneth Bobbit was denied visitation privileges to see his mother.[19] This occurred after she arrived at the reformatory with an individual who attempted to use false identification to enter the prison.[20]

The second incident involved another inmate, Kevin Black. His visitation privileges to see his mother and girlfriend were suspended for a limited time.[21] This suspension occurred after Black was convicted of possessing contraband, which was found immediately after a visit with his mother and girlfriend.[22]

In each of these incidents the inmates had their visitation privileges suspended with regard to certain individuals, without a hearing; however, the inmates were not prevented from receiving other visitors.[23] As a result of these suspensions, the prisoners filed a petition with the district court alleging that the lack of a hearing prior to the suspension of their visitation privileges violated the provisions of the consent decree.[24] They further alleged that they possessed a protected liberty interest in visitation under the due process clause of the fourteenth amendment.[25] The prisoners sought a court order requiring prison officials to give prisoners notice and to provide a hearing before

---

14. *Id.* at 37.
15. *Id.*
16. *Thompson*, 109 S. Ct. at 1906.
17. *Id.* at 1907 n.2.
18. *Id.* at 1907.
19. Thompson v. Kentucky Dep't of Corrections, 833 F.2d 614, 615 (6th Cir. 1987).
20. *Id.* at 616.
21. *Id.*
22. *Id.* at 614.
23. Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904, 1907 (1989).
24. The consent decree in *Kendrick v. Bland* also contained applicable regulations for the Kentucky State Reformatory at LaGrange. *See* Kendrick v. Bland, 541 F. Supp. 21, 46 (W.D. Ky. 1981).
25. *Thompson*, 109 S. Ct. at 1907.



restricting visitation privileges.[26]

### III. Procedural History

The United States District Court for the Western District of Kentucky found that the prisoners did in fact possess a liberty interest in visitation.[27] The district court ordered prison officials to establish at least minimal due process procedures to be followed before the restriction of visitation privileges.[28] The Commonwealth of Kentucky appealed the decision to the United States Court of Appeals for the Sixth Circuit.[29]

The court of appeals agreed with the district court that the language of the prison procedures memorandum, together with other regulations, created a protected liberty interest in visitation.[30] The court of appeals found that these regulations provided the necessary substantive predicates to limit official discretion and used the requisite mandatory language.[31] However, the case was remanded to the district court[32] to determine which particular set of regulations applied to the plaintiffs and to define the "particular procedural process due the plaintiffs when visitation is denied."[33]

In its opinion, the court of appeals noted the common principles used in determining the existence of a protected liberty interest. The court of appeals recognized that "certain rights and interests are so inherent in our society that they may be infringed only if procedural due process is afforded."[34] That is, there are some liberties derived from the Constitution itself that are so basic and fundamental that they must be afforded protection. In addition, the court of appeals noted that "the State may build up the public's expectations of a protected interest in other areas by enactment of statutes, regulations and other state actions."[35] Accordingly, there are some individual interests which can arise from state creation that may also warrant the protection of due process procedures. It is this type of liberty interest that was at issue in *Thompson*.

In reaching its decision, the court of appeals reviewed the state regulations in order to determine "whether the state went beyond the

---

26. *Id.* at 1908.
27. *Id.* at 1907.
28. Thompson v. Kentucky Dep't of Corrections, 833 F.2d 614, 615 (6th Cir. 1987).
29. *Id.*
30. *Id.* at 619.
31. *Id. See infra* note 192.
32. *Thompson*, 833 F.2d at 619.
33. *Id.*
34. *Id.* at 615.
35. *Id.*

---

establishment of mere guidelines by using 'mandatory language' in connection with 'specific substantive predicates.'"[36] The court of appeals interpreted the use of the words "shall" and "is" throughout the consent decree and the policy statements regarding visitation to satisfy the mandatory language requirement.[37] This, along with the "substantive limitations on official discretion" provided in the regulations, was considered adequate to create a "'legitimate claim of entitlement' [to visitation] . . . rather than a mere 'unilateral expectation.'"[38] The court of appeals found that the regulations created a protected liberty interest in visitation under the due process clause.[39] After the case was remanded to the district court, the court of appeals denied a petition for a rehearing en banc. The United States Supreme Court granted a writ of certiorari on June 27, 1988.[40]

### IV. The Supreme Court Opinion

#### A. *The Majority Opinion*

The Supreme Court rejected the conclusions of the court of appeals and held that the Kentucky prison regulations and procedures at issue did not create a protected liberty interest under the due process clause.[41] Justice Blackmun, writing for the majority, concluded that the regulations and procedures at issue did provide "certain 'substantive predicates to guide the decisionmaker.'"[42] They were, however, found to "lack the requisite relevant mandatory language."[43] The Court reasoned that such mandatory language was necessary in connection with the established substantive predicates in order to "mandat[e] the outcome to be reached upon a finding that the relevant criteria have been met."[44]

In reaching its decision, the Court relied heavily on its 1983 decision in *Hewitt v. Helms*.[45] In *Hewitt*, the Court held that an inmate has a protected liberty interest in remaining in the general prison population in light of the Pennsylvania regulations regarding administrative segregation.[46] The Court in *Hewitt* stated: "we are persuaded that the

---

36. *Id.* at 618 (quoting Hewitt v. Helms, 459 U.S. 460, 472 (1983)).
37. *Id.* at 618.
38. *Id.* at 617 (quoting Beard v. Livesay, 789 F.2d 874, 877 (6th Cir. 1986)).
39. *Id.* at 619.
40. Petitioner's Brief at 1, Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904 (1989) (No. 87-1815).
41. Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904, 1911 (1989).
42. *Id.* at 1910 (quoting Hewitt v. Helms, 459 U.S. 460, 472 (1983)).
43. *Id.*
44. *Id.* at 1909.
45. 459 U.S. 460 (1983).
46. *Hewitt*, 459 U.S. at 470-71.

repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest.[47] Using the same analysis, the Court in *Thompson* found it crucial that the visitation regulations lacked the requisite mandatory language.[48] The Court reasoned that without such mandatory language, no prisoner could reasonably expect visitation rights based solely on one of the substantive predicates.[49] Prison administrators still reserved the right to allow or disallow visitors as they saw fit.[50] Therefore, as the Court stated: "[t]he overall effect of the regulations [was] not such that an inmate [could] reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions."[51]

The formation of an objective expectation is the crucial component under this analysis in order to establish a state created liberty interest. For an individual's interest to rise to the level of importance of a protected liberty interest for fourteenth amendment purposes, it must "rise to more than 'an abstract need or desire' and must be based on more than 'a unilateral hope.'"[52] "Rather, an individual claiming a protected liberty interest must have a legitimate claim of entitlement to it."[53]

In its decision, the Court also rejected the notion that the significance of the interest to be protected or the grievousness of the loss should be considered in determining whether a protected liberty interest exists.[54] The Court maintained that the "method of inquiry in these cases always has been to examine closely the language of the relevant statutes and regulations."[55] As noted earlier, the Court found that the regulations at issue in this case, although they provided certain substantive predicates, lacked the "requisite relevant mandatory language."[56] As such, the Court found that no protected liberty interest in visitation was created.

B. *The Dissenting Opinion*

Justice Marshall advocated the application of an entirely different

47. *Id.* at 472.
48. *Thompson*, 109 S. Ct. at 1911.
49. *Id.*
50. *Id.*
51. *Id.*
52. *Thompson*, 109 S. Ct. at 1908 (quoting Board of Regents v. Roth, 408 U.S. 564, 577 (1972); Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465 (1981)).
53. *Id.*
54. *Thompson*, 109 S. Ct. at 1909.
55. *Id.*
56. *Id.* at 1910.

analysis.[57] In his dissenting opinion, Justice Marshall argued that in cases involving prisoners' liberty interests, the Court should instead weigh and examine the significance of the interest to be protected.[58] Justice Marshall stated that "when prison authorities alter a prisoner's conditions of confinement, the relevant question should be whether the prisoner has suffered a 'sufficiently grievous loss' to trigger the protection of due process."[59] It is this type of analysis, Justice Marshall argued, which would work to avoid the possibility of "unbridled governmental power over the basic human need to see family members and friends."[60] To find such a right in visitation would, as he noted, "merely afford prisoners rudimentary procedural safeguards against retaliatory or arbitrary denials of visits."[61]

Justice Marshall also challenged the majority's opinion on the grounds of its own analysis.[62] Justice Marshall argued that the majority's insistence upon mandatory language was misplaced.[63] He contended that once it is established that there are guidelines limiting official discretion, such as the substantive predicates provided in the regulations in *Thompson*, it is illogical to assume that they will not be followed simply because they lack words such as "shall" or "must."[64] As Justice Marshall noted: "[a]bsent concrete evidence that state officials routinely ignore substantive criteria set forth in [the] statutes or regulations . . . it is only proper to assume that the criteria are employed *in practice*, thereby creating legitimate expectations worthy of protection by the Due Process Clause."[65] Justice Marshall further argued that it is also illogical to believe that any expectation created by practice could be negated by using the word "may" in a regulation, rather than "shall."[66]

Furthermore, it was Justice Marshall's position that even under the majority's analysis, a liberty interest was created because the regulations did contain the requisite mandatory language.[67] Justice Marshall argued that under the regulations "[t]he duty officer [did] not have unfettered discretion with respect to visitors. Rather, he 'ha[d] the responsibility of denying . . . visit[s for a number of enumerated]

57. *Id.* at 1912 (Marshall, J., dissenting).
58. Justices Brennan and Stevens joined Justice Marshall in his dissent. *Id.*
59. *Id.* (quoting Olim v. Wakinekona, 461 U.S. 238, 252 (1983)).
60. *Id.* at 1911 (Marshall, J., dissenting).
61. *Id.*
62. *Id.* at 1914 (Marshall, J., dissenting).
63. *Id.*
64. *Id.*
65. *Id.*
66. *Id.*
67. *Id.* at 1915 (Marshall, J., dissenting).

240       CRIMINAL AND CIVIL CONFINEMENT       [Vol. 17:1

reasons.'"[68]

Finally, Justice Marshall made it clear in his dissent that the use of the word "may" in regulations has not defeated the creation of liberty interests in other cases.[69] He further pointed out that, by allowing the use of the word "may" to defeat a liberty interest in this case, "the majority thus establishe[d] that when visitors are turned away, *no process, not even notice, is constitutionally due.*"[70]

## V.  DEVELOPMENT OF PRISONERS' DUE PROCESS

The gradual definition of those interests in life, liberty and property, which are to be afforded the procedural protections of the due process clause, has been a long process of evolution. This process has dealt more with abstract concepts of liberty and less with concrete definitions.[71] As one author noted, however, it is this ever-changing and dynamic nature of the due process clause which is essential to its purpose of affording procedural protections and limitations on "the manner in which governmental power is exercised on the individual."[72] The Supreme Court's earlier interpretations of liberty interests, and the protections to be afforded them, dealt with "broad definitions" of so-called "core" liberty interests.[73] These were interpretations generally stemming from the Court's substantive due process analysis.[74] The Court also found that there were some due process protections

---

68. *Id.* (citation omitted).

69. *Id.* at 1916 (citing Hewitt v. Helms, 459 U.S. 460 (1983); Vitek v. Jones, 445 U.S. 478 (1980)). *See infra* note 150.

70. *Thompson,* 109 S. Ct. at 1917.

71. *See* L. TRIBE, AMERICAN CONSTITUTIONAL LAW § 10-8 (2d ed. 1988).

72. Kadish, *Methodology and Criteria in Due Process Adjudication—A Survey and Criticism,* 66 YALE L.J. 319, 340 (1957). As Professor Kadish points out, static definitions of liberty in the due process analysis would disserve its intended purpose:

> Freezing the meaning of due process, which in the final analysis is more a moral command than a strictly jural precept, destroys the chief virtue of its generality: its elasticity. Future generations would become bound to the perceptions of an earlier one; the experience that develops with the changing modes of governmental power, unpredicted and unpredictable at an earlier time, as well as the deeper insights into the nature of man in organized society that are gained in continually changing social contexts, would become irrelevant.

*Id.* at 341.

73. TRIBE, *supra* note 71, § 10-8, at 679.

74. *Id.* The so-called "core" or "fundamental" liberty interests are said to include: not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, [and] to worship God according to the dictates of [one's] own conscience . . . .

Meyer v. Nebraska, 262 U.S. 390, 399 (1923).

---

1991]    *KENTUCKY DEP'T OF CORRECTIONS v. THOMPSON*    241

necessary to preserve notions of fundamental fairness in dealings between individuals and the government.[75]

Another stage in the development of the due process analysis was the "right-privilege" doctrine.[76] This doctrine was first enunciated by Justice Holmes in *McAuliffe v. Mayor of New Bedford.*[77] The basic premise of this doctrine was that the protections of the due process clause are only necessary to protect those interests characterized as "rights," and no procedural protection is necessary to preserve those interests which are characterized as mere "privileges."[78]

The Supreme Court's early interpretations of liberty were somewhat limited and tended to be narrow in scope.[79] In the early 1970's, however, new concepts of liberty and property began to emerge.[80] These ideas stem from concepts based on the premise that the state may itself create property and liberty interests through its actions, including entitlement programs, government employment, and other benefits. The basic idea is that individuals' reliance on, and expectations of, these benefits are liberty interests which should be afforded the protections of the due process clause.[81] These new concepts of liberty and property began to significantly widen the Court's interpretation of those interests deserving procedural protection of the due process clause.[82] In addition, the Court's adoption of these concepts also brought an end to the "right-privilege" distinction in the due process analysis.[83]

This new approach, known to commentators as the "positivist"[84] or "entitlements"[85] theory was applied by the Court for the first time in

---

75. TRIBE, *supra* note 71, § 10-8, at 679 (notice and an opportunity to be heard are generally considered necessary to preserve notions of fundamental fairness). *See also* Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 126 (1951) (designating organizations as communist without notice or a hearing is violative of due process).

76. Herman, *supra* note 6, at 486-87.

77. 155 Mass. 216, 29 N.E. 517 (1892).

78. Herman, *supra* note 6, at 487. The "right-privilege" doctrine draws a distinction "between individual 'rights' stemming from constitutional or common law sources and mere 'privileges' bestowed by the government." L. TRIBE, *supra* note 71, § 10-8, at 681.

79. *The Supreme Court, 1982 Term,* 97 HARV. L. REV. 70, 103 (1983) [hereinafter *The Supreme Court*].

80. TRIBE, *supra* note 71, § 10-9, at 685.

81. *Id.* The ideas upon which this doctrine is based were originally developed and explained by Professor Charles Reich in his now famous 1964 law review article, *The New Property. See* Reich, *The New Property,* 73 YALE L.J. 733 (1964).

82. TRIBE, *supra* note 71, § 10-9, at 685. *See also The Supreme Court, supra* note 79, at 103 n.4.

83. Herman, *supra* note 6, at 488.

84. *Id.* at 486.

85. TRIBE, *supra* note 71, § 10-9, at 686.





*Goldberg v. Kelly*.[86] In *Goldberg*, the Court held that welfare benefits were a "matter of statutory entitlement for those persons qualified to receive them."[87] Therefore, they constituted an interest in property which required the procedural protections of due process.[88] This new approach developed quickly in shaping the Court's definition of property interests[89] and eventually became an integral part of the Court's definition of liberty interests as well.[90]

The basic application of this liberty interest analysis is that there are two sources from which liberty interests can arise: (1) the Constitution itself[91] and (2) state law.[92] Some fundamental constitutional rights are expressly provided for in the Bill of Rights. Because of their incorporation into the fourteenth amendment these rights are protected from state infringement by the due process clause.[93] In addition to these rights, there are interests that "attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law."[94] Therefore, "the procedural guarantees of the Fourteenth Amendment apply whenever the State seeks to remove or significantly alter that protected status."[95]

Most of the development of state created liberty interests has arisen in the context of prisoners' rights cases. This is due to the Court finding independent constitutional grounds for liberty, arising from the due process clause itself, in many other types of cases.[96] Lawfully

---

86. 397 U.S. 254 (1969). *See* Herman, *supra* note 6, at 489.

87. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

88. *Id.*

89. *See* Herman, *supra* note 6, at 490-503. *See, e.g.* Bishop v. Wood, 426 U.S. 341 (1976) (the Court examined the language of statutes to determine whether an employee had an enforceable expectation in continued employment); Board of Regents v. Roth, 408 U.S. 564 (1972) (the Court found that an individual's interest must be within the sphere of life, liberty, or property to trigger the protections of the due process clause).

90. *See* Herman, *supra* note 6, at 499-503. Justice Rehnquist noted in Paul v. Davis, 424 U.S. 693 (1976):

[Liberty interests are divided] into two categories. Some interests — those guaranteed in "one of the provisions of the Bill of Rights which has been 'incorporated' into the Fourteenth Amendment," or, generally speaking, 'fundamental' constitutional rights . . . [and other] interests not recognized by the Constitution [which] would be "liberty" or "property" interests only if they had been initially recognized and created by state law.

Herman, *supra* note 6, at 500.

91. Paul v. Davis, 424 U.S. 693, 710-11 n.5 (1976).

92. *Id.* at 710.

93. *Id.* at 710-11 n.5.

94. *Id.* at 710.

95. *Id.*

96. *See* Herman, *supra* note 6, at 502. *See generally* Youngberg v. Romeo, 457 U.S. 307 (1982) (committed individuals possess a liberty interest in safety and freedom from undue restraint arising from the due process clause itself); Ingraham v. Wright, 430 U.S. 651

---

incarcerated prisoners must depend on state created liberty interests because the Supreme Court has "consistently refused to recognize more than the most basic liberty interests in prisoners."[97] This stems ated for committing a crime, he or she "retain[s] only a narrow range of protected liberty interests."[98] Such "withdrawal [and] limitation of many privileges and rights, [is seen as] a retraction justified by the considerations underlying our penal system."[99] Prisoners' conditions of confinement are, therefore, not subject to a great deal of protection under the due process clause. "As long as the conditions or degree of confinement to which the prisoner is subjected is within the sentence imposed upon him and is not otherwise violative of the Constitution," the need for the protections of the due process clause does not arise.[100]

Given the fact that prisoners retain only a "narrow range of protected liberty interests"[101] grounded in the Constitution, the creation of protected liberty interests from state laws and regulations becomes crucial. The creation of protected liberty interests from state law was originally intended to expand procedural protections of the due process clause beyond the so-called "fundamental" liberties contained in the Constitution.[102] Earlier cases allowed for state creation of liberty interests through a non-formalistic approach which focused more on the conditions of confinement and length of custody[103] and put little emphasis on the precise content of state law.[104]

---

(1977) (corporal punishment inflicting appreciable physical pain violated the due process clause in and of itself); McNeil v. Director, Patuxent Inst., 407 U.S. 245 (1972) (commitment after criminal sentence served violated the due process clause in and of itself).

97. Hewitt v. Helms, 459 U.S. 460, 467 (1983).

98. *Id.*

99. *Id.* (quoting Price v. Johnston, 334 U.S. 266 (1948)). *See also* Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979) (no constitutional right to parole); Meachum v. Fano, 427 U.S. 215, 224 (1976) (no constitutional protection against transfer within the prison system); Wolff v. McDonnell, 418 U.S. 539, 557 (1974) (no constitutional guaranty of parole).

100. Montanye v. Haymes, 427 U.S. 236, 242 (1976). The rationale is that a prisoner has already been afforded the protections of the due process clause in the process of his/her lawful conviction. As a result of such, he has been "constitutionally deprived of his liberty." The prisoner may therefore be imprisoned by the state, and as long as the rules of the prison system are not otherwise violative of the Constitution, his/her liberty interests are "extinguished." *See* Meachum v. Fano, 427 U.S. 215, 225 (1976).

101. *Hewitt*, 459 U.S. at 467.

102. TRIBE, *supra* note 71, § 10-11, at 701.

103. *See* Wolff v. McDonnell, 418 U.S. 539 (1974); Morrissey v. Brewer, 408 U.S. 471 (1972). *See also infra* note 104.

104. Herman, *supra* note 6, at 508-09. Professor Herman discusses in her article, for example, the case of *Wolff v. McDonnell*, 418 U.S. 539 (1974) wherein the Court found that Nebraska had created a statutory right and a protected liberty interest in good-time credit. Herman noted that the Court was somewhat vague regarding the source of the liberty

The majority of the early, more expansive prisoners' rights cases were decided by the Court under Chief Justice Burger.[105] However, the Court's expansive view in these cases soon gave way to a more restrictive approach[106] as a result of the Court's concern over federalism and judicial activism.[107]

This more restrictive view was first adopted by the majority of the Supreme Court in *Meachum v. Fano*.[108] In *Meachum*, the Court held that Massachusetts' prison regulations did not create a liberty interest in remaining in the same state prison.[109] Based on the applicable statutes and regulations, the Court found that prison officials retained the "discretion to transfer prisoners for any number of reasons"[110] and were not limited to "instances of serious misconduct."[111] The Court held that no liberty interest arose because, despite whatever expectations a prisoner might form, they were "too ephemeral and insubstantial to trigger procedural due process protections."[112]

The Court also emphasized that to find a protected liberty interest in such a situation would "involve the judiciary in issues and discretionary decisions that are not the business of federal judges."[113] This would be an unacceptable result because the supervision and day-to-day operation of prisons is seen as an "acute" interest of the states, and not a matter for the judiciary.[114] Consequently, the Court has traditionally been unwilling to place the federal judiciary in a supervisory role over state prisons.[115]

interest and that it seemed to be based more on "implicit promise[s]" than the content of state statutes. Herman, *supra* note 6, at 509. For examples of earlier, somewhat more prisoner cases see Gagnon v. Scarpelli, 411 U.S. 778 (1973) (liberty interest in having counsel prior to revocation of parole); Morrissey v. Brewer, 408 U.S. 471 (1972) (liberty interest in remaining on parole based on an implicit promise by the state).

105. *The Supreme Court, supra* note 79, at 107-08. *See also* Wolff v. McDonnell, 418 U.S. 539 (1974); Morrissey v. Brewer, 408 U.S. 471 (1972).
106. *The Supreme Court, supra* note 79, at 108.
107. *Id.* This author noted: "the majority's concerns about federalism and judicial activism . . . have engendered an alternative perspective . . . . [This perspective] defines prisoners' due process rights more restrictively." *Id.*
108. 427 U.S. 215 (1976).
109. *Meachum*, 427 U.S. at 226.
110. *Id.* at 228.
111. *Id.* The Court in *Meachum* distinguished *Wolff v. McDonnell* on the grounds that the liberty interest in *Wolff* was formed because the loss of good-time credit was predicated on "serious misconduct." *Id.* There was no such condition in the Massachusetts statute in *Meachum*, therefore no liberty interest was created. *Id.*
112. *Id.*
113. *Id.* at 228-29.
114. *Id.* at 229.
115. *See* Meachum v. Fano, 427 U.S. 215, 229 (1976) (federal courts do not sit to supervise state prisons); Preiser v. Rodriguez, 411 U.S. 475, 492 (1973) (state prison issues

The *Meachum*[116] decision significantly narrowed the earlier expansive view of prisoners' due process.[117] The Court did not inquire at all into the transfer practices of the state prison system, but only examined the applicable state statutes.[118] The Court's strict statutory approach made no examination of whether liberty interests could be created by "mutually explicit understandings"[119] arising from reliance on actual state practices.

The narrow approach in *Meachum*[120] was highly criticized by some commentators.[121] As one critic noted, limiting the source of protected liberty interests to state statutory enactments and ignoring "independent understandings or practices,"[122] and the interests that might arise in reliance on them, "plac[ed] an enormous, unchecked power in the state legislature[s]."[123]

The process of limiting the sources of protected liberty interests expressed by the Supreme Court in *Meachum*[124] continued throughout the late 1970's.[125] This retreat from the earlier expansive view was illustrated in prisoners' rights cases as well as other types of due process cases.[126] The Supreme Court's approach has focused increasingly

are "peculiarly within state authority and expertise"); Johnson v. Avery, 393 U.S. 483, 486 (1969) (administration of state detention facilities are state functions).

116. 427 U.S. 215 (1976).
117. Comment, *Two Views of a Prisoner's Right to Due Process: Meachum v. Fano*, 12 HARV. C.R.-C.L. L. REV. 405, 415 (1977) [hereinafter *Two Views*]. *See* Note, *Prisoners' Rights, Institutional Needs, and the Burger Court*, 72 VA. L. REV. 161, 171-74 (1986) [hereinafter *Prisoners' Rights*]. *Compare* Morrissey v. Brewer, 408 U.S. 471 (1972) (Court found a liberty interest in parole based on state's "implicit promise") *with* Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979) (Court found no liberty interest arising from the possibility of parole).
118. *Meachum*, 427 U.S. at 226.
119. TRIBE, *supra* note 71, § 10-10, at 696. *See also Two Views, supra* note 117, at 415.
120. 427 U.S. 215 (1976).
121. *Two Views,*
122. *Two Views, supra* note 117, at 416. *See also* Herman, *supra* note 6, at 512. Professor Herman noted: "*Meachum* [is] superficially plausible theory of prisoners' liberty interests . . . severely restricts the due process claims, both substantive and procedural, that prisoners can raise in federal court. This result is scarcely accidental." Herman, *supra* note 6, at 512.
123. *Two Views, supra* note 117, at 416.
124. 427 U.S. 215 (1976).
125. *See generally* Connecticut Board of Pardons v. Dumschat, 452 U.S. 458 (1981) (constitutional entitlements must be found in state statutes, regulations or other rules); Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 11-12 (1979) (Court found protections of due process only apply to parole decisions in which the statutory structure and language provide a protectable entitlement); Montanye v. Haynes, 427 U.S. 236, 243 (1976) (Court found the language of New York statutes and regulations were not triggered despite the inmate's expectations).
126. *See also* Bishop v. Wood, 426 U.S. 341 (1976) (no property



on the precise statutory language in each particular case.[127] It also dismissed the premise that a "mutually explicit understanding"[128] might give rise to a protected liberty interest.

In the early 1980's the Court further endeavored to limit its initially expansive interpretations of the due process clause in prisoners' rights cases.[129] This was accomplished in two ways.[130] First, the Court narrowly defined the scope of prisoners' liberty interests grounded in the Constitution itself.[131] Second, the Court determined that, even when prisoners are found to possess a protected liberty interest, the necessary procedural due process protections are minimal.[132]

For example, the Supreme Court in *Olim v. Wakinekona*[133] found that a prison inmate's transfer from a Hawaii prison to one in California[134] did not deprive the prisoner of any liberty interest protected by the due process clause in and of itself.[135] The Court, citing *Meachum v. Fano*,[136] held that the determining factor in assessing whether an interest arises from the Constitution is "the nature of the interest involved rather than its weight."[137] That is to say, despite the severity or degree of any loss suffered by a prisoner, the protections of the due process clause are not invoked unless the interest is a type deemed protected.[138] Because these types of interests are narrowly inter-

interest in employment); Paul v. Davis, 424 U.S. 693 (1976) (state statutes provided no liberty interest in enjoyment of one's reputation).

127. See Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465 (1981); Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 12 (1979); Montanye v. Haymes, 427 U.S. 236, 243 (1976).

128. Jago v. Van Curen, 454 U.S. 14, 17 (1981) (per curiam). For a discussion of the idea of creating protected liberty interests from mutually explicit understandings, see TRIBE, supra note 71, § 10-10, at 694-700.

129. The Supreme Court, supra note 79, at 103. See Olim v. Wakinekona, 461 U.S. 238 (1983); Hewitt v. Helms, 459 U.S. 460 (1983).

130. The Supreme Court, supra note 79, at 104.

131. Id. at 108. See Olim v. Wakinekona, 461 U.S. 238 (1983) (due process clause itself provides no liberty interest in remaining in prison in the same state).

132. The Supreme Court, supra note 79, at 104. See Hewitt v. Helms, 459 U.S. 460 (1983) (only minimal due process procedures necessary to protect a prisoner's right to remain in the general prison population).

133. 461 U.S. 238 (1983).

134. Olim, 461 U.S. at 248.

135. Id.

136. 427 U.S. 215 (1976).

137. Olim v. Wakinekona, 461 U.S. 238, 248 (1983) (quoting Meachum v. Fano, 427 U.S. 215, 224 (1976)).

138. Olim, 461 U.S. at 247. The analysis of examining the "grievousness of the loss" in determining whether the protections of due process are necessary has been the major alternative view to the strict statutory approach the Court applies to procedural due process analysis. See Two Views, supra note 117, at 421. This view has often been expressed by a dissenting Justice Marshall in cases where the majority of the Court has

---

preted,[139] they are essentially limited to only the most fundamental human liberties.[140]

In addition to limiting the "core" liberty interests of prisoners, the Court narrowed the circumstances under which a state statute or regulation could give rise to a protected liberty interest.[141] The Court did this by requiring statutes to meet "formalistic" and rigid criteria.[142] For example, in *Hewitt v. Helms*[143] the Court stated that a "careful procedural structure"[144] to "channel the decisonmaking [sic] of prison officials"[145] cannot give rise to a protected liberty interest. Rather, liberty interests will only arise where the statutes and regulations at issue contain "specific substantive predicates" and "explicitly mandatory language."[146] Based on the statutory structure in *Hewitt*,[147] the Court found that a liberty interest had in fact been created in remaining within the general prison population.[148] The Court, however, weighed this interest against the important considerations of "wide-ranging deference" to prison officials[149] in order to "preserve internal order and discipline and to maintain institutional security."[150] As a result, the Court required that the prisoners be provided with only minimal procedural protections before being removed from the

applied a narrow statutory approach. See, e.g., Olim v. Wakinekona, 461 U.S. 238, 252 (1983) (Marshall, J., dissenting). Another alternative view to a strict statutory approach that has been expressed by some members of the Court is somewhat analogous to equal protection analysis. This approach holds that prisoners have a protected liberty interest in any arbitrary governmental action placing them in a disfavored class, the procedural protections of due process are required. See, e.g. Hewitt v. Helms, 459 U.S. 460, 486 (1983) (Stevens, J. dissenting). For a discussion of the major opposing views to the strict statutory approach used by the Court in due process analysis, see Two Views, supra note 117, at 421 (a discussion of the "grievousness of the loss" or "impact" approach to due process analysis).

139. See Olim v. Wakinekona, 461 U.S. 238, 244 (1983); Hewitt v. Helms, 459 U.S. 460, 467 (1983); Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 7 (1979); Meachum v. Fano, 427 U.S. 215, 225 (1976).

140. See supra note 74.

141. The Supreme Court, supra note 79, at 110.

142. Id.

143. 459 U.S. 460 (1983).

144. Hewitt, 459 U.S. at 471.

145. Id.

146. Id. at 472. For a discussion and criticism of the Court's somewhat formalistic approach taken in Hewitt and the state of prisoners' due process and protected liberty interests before the Court's decision in Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904 (1989), see TRIBE, supra note 71, § 10-10, at 698.

147. 459 U.S. 460 (1983).

148. Hewitt, 459 U.S. at 472.

149. Id. (citing Bell v. Wolfish, 441 U.S. 520, 547 (1979)).

150. Id.

general prison population and being placed in administrative segregation.[151]

The Supreme Court's decisions in *Hewitt* and *Olim* left the Court with a rather narrow view of protected liberty interests for prisoners.[152] As one commentator noted, the Court had "define[d] prisoners' core liberty interests so narrowly that they are rarely, if ever, to be found."[153] Additionally, the Court's adherence to the view that "a liberty interest will almost never be created by state action in the absence of a statute or regulations,"[154] along with the requirement that these statutes and regulations "meet a number of formalistic criteria,"[155] "tends to deny the fourteenth amendment's protection to one of the classes of persons most in need of it"[156]—prisoners.

## VI. CRITICISM AND CONSEQUENCES

In *Thompson*,[157] the Court demonstrated its willingness to continue the narrowing trend in cases involving prisoners' liberty interests under the due process clause. It is the first time since Chief Justice Rehnquist's appointment that the Court used its strict statutory analysis to deny the existence of a protected liberty interest for prisoners.[158] The decision further illustrated the Court's continued reluctance to recognize anything but the most basic constitutional rights for prisoners.[159]

As Justice Marshall pointed out in his dissent, the majority of the Court's recognition that prisoners retain a "residuum" of basic constitutional rights under the due process clause[160] is a hollow gesture. Justice Marshall stated: "in practice the[se] interest[s] crystalize[]

151. *Id.* at 476. The Court found that "an informal, non-adversary evidentiary review is sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation. . . ." *Id.*
152. TRIBE, *supra* note 71, § 10-10, at 698 n.32.
153. *The Supreme Court, supra* note 79, at 108.
154. *Id.* at 110.
155. *Id.*
156. *Id.* at 111.
157. 109 S. Ct. 1904 (1989).
158. Chief Justice Rehnquist was appointed Chief Justice in September of 1986. 478 U.S. VII (1986) (appointment of Chief Justice Rehnquist). Since that time, the only major case in which the Court has addressed the question of protected liberty interests of prisoners with this strict statutory analysis was Board of Pardons v. Allen, 482 U.S. 369 (1987). In *Allen*, the Court found a protected liberty interest to exist in parole release. *Id.* at 381. The *Thompson* decision is the first time the Rehnquist Court has addressed the issue and denied the existence of a liberty interest based on the strict statutory analysis enunciated in *Hewitt*.
159. *See supra* note 100 and accompanying text.
160. *Thompson*, 109 S. Ct. 1904, 1911 (1989) (Marshall, J., dissenting).

only on those infrequent occasions when a majority of the Court happens to say so."[161] As a result of the Court's reluctance to recognize prisoners' liberty interests based in the Constitution itself, the approach applied by the majority of the Court limits, almost entirely, the existence of protected liberty interests to an analysis "solely involving State created rights."[162]

The problems with the Court's opinion in *Thompson* are not so much with the type of analysis used, but rather with the potential danger such an analysis provides. The danger is that the Court may, in effect, impose its own subjective judgments in deciding what interests warrant a protected liberty interest. Central to the Court's analysis of whether a protected liberty interest exists is the question of whether the relevant statutes and regulations provide specific substantive predicates and mandatory language.[163] These are considered necessary to determine whether the decision making authority of prison officials is sufficiently constrained.[164] This question is now being addressed in an almost entirely semantic approach,[165] rather than through consideration of any actual circumstances regarding whether prison officials' decision-making is *actually* constrained.[166]

Consequently, the use of mandatory terms, such as "shall" or "must," in a statute or regulation is more likely to give rise to a protected liberty interest than the use of terms such as "may."[167] The problem with such an analysis is twofold. First, even though the use of certain mandatory words in statutes and regulations makes it more likely that a protected liberty interest will be found, this is not necessarily so.[168] Second, predicating the existence of prisoners' due process rights on the choice of language in state statutes and regulations

161. *Id.* at 1912 (Marshall, J., dissenting).
162. *Id.* at 1912 n.2.
163. *See supra* note 192.
164. *See Thompson*, 109 S. Ct. 1904, 1910 (1989); Hewitt v. Helms, 459 U.S. 460, 472 (1983).
165. In *Thompson* the Court did not examine any practices of prison officials, nor did it make any practical analysis of the effect of the regulations on the prison population. The Court examined *only* the structure and wording of the applicable regulations. *Thompson*, 109 S. Ct. at 1909.
166. *See Thompson*, 109 S. Ct. at 1914 (Marshall, J., dissenting).
167. *See Thompson*, 109 S. Ct. 1904, 1911 (1989); Board of Pardons v. Allen, 482 U.S. 369, 377 (1987); Hewitt v. Helms, 459 U.S. 460, 472 (1983); Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 11-16 (1979).
168. The regulations in *Thompson* did in fact contain some mandatory language. For example, the language of the consent decree contained the words "shall" and "is" with regard to visitation. The Court, however, by examining mostly the procedures memorandum, found the mandatory language lacking. *See* Vitek v. Jones, 445 U.S. 480, 483 (1980) (applicable statutes regarding involuntary transfer to a mental hospital used "may" rather than "shall" and did not prevent the creation of a liberty interest).



1991]     KENTUCKY DEP'T OF CORRECTIONS v. THOMPSON     251

grievousness of the loss suffered by the prisoner[181] or rely on its own "judgment as to what interests are more significant than others,"[182] the Court arguably does just that. Illustrative of this is the fact that in Hewitt[183] the prisoner was confined to administrative segregation for almost two months before receiving any meaningful procedural due process protections.[184] Contrastingly, the inmates in Thompson[185] were denied visitation privileges to see certain individuals for a limited time but were not prevented from seeing other visitors.[186] It would appear that the deprivation of the prisoner's liberties in Hewitt[187] were arguably more severe than those suffered by the prisoners in Thompson.[188] As evidenced by this dichotomy and the different results in each case, it may be that the Court does in fact examine the significance of the interest at stake. The Court may be considering its own judgment regarding what interests are more important in addition to, if not rather than, the language of the applicable statutes.[189]

The Supreme Court's decisions on protected liberty interests for

denied visitation without a hearing. This, however, was only for a limited time, and they were allowed to receive other visitors. Thompson, 109 S. Ct. at 1907.

181. See Thompson, 109 S. Ct. at 1912 (Marshall, J., dissenting). Justice Marshall argues in his dissenting opinion in Thompson that the proper analysis in these cases should focus on "whether the prisoner has suffered 'a sufficiently grievous loss' to trigger the protection of Due Process." Id. (quoting Olim v. Wakinekona, 461 U.S. 238, 252 (1983)). See infra note 189 and accompanying text. The Supreme Court, however, insists that such an analysis is not relevant to the existence of protected liberty interests. The Court purports to use a strict statutory inquiry. Thompson, 109 S. Ct. at 1909.

182. Thompson, 109 S. Ct. at 1909.

183. Hewitt v. Helms, 459 U.S. 460 (1983).

184. Id. at 462-65.

185. Thompson, 109 S. Ct. at 1904.

186. Id. at 1907.

187. 459 U.S. 460 (1983).

188. 109 S. Ct. 1904 (1989).

189. It is arguable that the Court in its analysis does in fact look at the nature of the interest to be protected and the factual circumstances in each case. This is contrary to the strict statutory analysis that the Court claims to apply in Thompson. Illustrative of this is the fact that in the majority of cases in which the Court finds that prisoners possess a protected liberty interest, the interest is closely related to the "duration or nature from confinement, or the very nature of confinement." Thompson, 109 S. Ct. 1904, 1909 n.3 (1989) (citing Brief for the Petitioners at 10). See, e.g., Board of Pardons v. Allen, 482 U.S. 369 (1987) (liberty interest in parole); Hewitt v. Helms, 459 U.S. 460 (1983) (liberty interest in remaining in the general prison population); Vitek v. Jones, 445 U.S. 478 (1980) (liberty interest in not being transferred to a mental hospital); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1 (1979) (liberty interest in good-time credits). In contrast, in the majority of cases where the Court has found no liberty interest, the interest at stake seemed somewhat less crucial, and generally did not deal with the length or nature of confinement. See, e.g., Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904 (1989) (no liberty interest in visitation); Olim v. Wakinekona, 461 U.S. 238 (1983) (no liberty interest in remaining in prison in the same state); Meachum v. Fano, 427

---

250     CRIMINAL AND CIVIL CONFINEMENT     [Vol. 17:1]

places a great deal of power in the state legislatures.[169] This, at best, could lead to the inadvertent creation or destruction of liberty interests depending on the state's choice of language.[170] At worst, this could result in legislative manipulation of prisoners' rights by purposeful inclusion and exclusion of the required language.[171]

The Court in Thompson found that the use of the word "may" in the procedures memorandum regarding visitation caused the regulations to lack the necessary mandatory language. As a result, it precluded the creation of a protected liberty interest.[172] However, in other cases using the same analysis, the Court has found liberty interests created from statutes using the word "may,"[173] For instance, the applicable regulations in Hewitt v. Helms[174] contained the word "may"[175] and did not substantially hinder prison officials' discretion any more than the regulations in Thompson.[176] Nevertheless, the use of the term "may" in Hewitt did not prevent the creation of a protected liberty interest in remaining in the general prison population.[177]

Although the procedural structures in Thompson[178] and Hewitt[179] did not vary to any great extent, the factual circumstances of the cases did.[180] It seems that, although the Court claims not to consider the

169. It is the basic purpose of the fourteenth amendment to protect individuals from the arbitrary actions of the government which may infringe on their basic rights. See Kadish, supra note 72, at 340. It seems that since the government has the power to choose the statutory language of prison regulations, it therefore has the power to create and define what rights prisoners possess under the due process clause. It is hard to imagine a government action more in need of some restraint than this. See Two Views, supra note 117, at 416-17.

170. See Two Views, supra note 117, at 416-17.

171. Id. at 417.

172. Thompson, 109 S. Ct. at 1911.

173. See Hewitt v. Helms, 459 U.S. 460, 470 (1983). In Hewitt, the Court found that Pennsylvania statutes created a protected liberty interest in remaining in the general prison population. Id. at 472. The language of these statutes quite prominently used the word "may" rather than the word "shall" in a number of instances. Id. at 470. See also Vitek v. Jones, 445 U.S. 480, 483 (1980). In Vitek the Court found that Nebraska statutes had created a liberty interest in not being involuntarily transferred to a mental hospital. Id. at 494. However, the relevant statutes contained only the word "may" and nowhere used the word "shall." Id. at 483-84.

174. 459 U.S. 460 (1983).

175. Id. at 470.

176. 109 S. Ct. 1904, 1906-07 nn.1-2 (1989).

177. Hewitt, 459 U.S. at 472.

178. Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904 (1989).

179. 459 U.S. 460 (1983).

180. In Hewitt, a prisoner remained in administrative segregation for almost two months before receiving a hearing and was then placed in administrative segregation for another six months. Hewitt, 459 U.S. at 462-65. In Thompson, by comparison, the prisoners were each

prisoners are somewhat inconsistent, yielding different results in cases with quite similar statutory language.[190] Consequently, there is some uncertainty as to whether certain state statutes and regulations would give rise to a protected liberty interest in any particular situation. Granted, a statute specifically designed to provide substantive predicates and using what the Court recognized as mandatory language (such as "shall" or "must") would almost certainly, in light of precedent, create a protected liberty interest.[191] Furthermore, a liberty interest would probably not be found where the applicable statutes are wholly lacking mandatory language.[192] There is, however, a grey area wherein the statutes and regulations use a mix of both mandatory and permissive language; for instance, the language used in the statutes and regulations in Thompson[193] and Hewitt.[194] It is in this area that the Court may be more prone to rely on a subjective judgment as to the significance of the interest at stake. In such a situation, the Court may use the semantic pretext of mandatory language to either recognize or deny the creation of a protected liberty interest.

The Supreme Court's emphasis on the content of state law may also lead to other problems. The statutes and regulations applicable in each case are, for the most part, not designed to create protected liberty interests nor to ensure that none will arise. State legislatures enact prison statutes and regulations in order to advance the state's penological goals and to place some guidelines and restrictions on

U.S. 215 (1976) (no liberty interest in remaining in the same prison); Montanye v. Haymes, 427 U.S. 236 (1976) (same).

190. Compare Meachum v. Fano, 427 U.S. 215, 227 (1976) (no liberty interest in remaining in the same prison arose from regulations using the word "may" and vesting a degree of discretion in prison officials) with Vitek v. Jones, 445 U.S. 480, 483-84 (1980) (a liberty interest in not being involuntarily transferred to a mental hospital arose from statutes using the word "may" and almost entirely lacking mandatory language).

191. A liberty interest, however, will not necessarily be created as evidenced by the Supreme Court's opinion in Vitek v. Jones, 445 U.S. 480, 483 (1980), wherein the Court found a liberty interest in not being involuntarily transferred to a mental hospital based on a statute which entirely lacked mandatory language. Id.

192. The test the Supreme Court will follow in determining the existence of prisoners' protected liberty interests under the due process clause is clearly enunciated in the Thompson decision. That is, that a state created liberty interest may arise only if: (1) the applicable statutes and regulations establish substantive predicates to govern official discretion; and (2) the statutes and regulations also contain the requisite mandatory language (i.e. "shall" or "must"), thus "mandating the outcome to be reached upon a finding that the relevant criteria have been met.'" Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904, 1909 (1989) (citing Hewitt v. Helms, 459 U.S. 460, 472 (1983)). It seems unlikely that the Supreme Court will deviate substantially from this analysis considering the narrowing trend of cases and the more conservative composition of the Court.

193. Thompson, 109 S. Ct. at 1911.

194. Hewitt v. Helms, 459 U.S. 460, 470 n.6 (1983).

prison officials.[195] By allowing these statutes and regulations to effectively be the only source of prisoners' due process liberty interests, some important interests may inadvertently remain unrecognized. Ironically, other liberty interests may mistakenly be created in somewhat less important areas.[196]

Even more dangerous consequences of this type of analysis might occur. If state statutory enactments and regulations can result in the creation, destruction, and control of the due process rights of prisoners,[197] then the constitutional rights of prisoners will be subject to the tides and trends of the political process.[198] The states themselves will be involved in deciding what rights prisoners will have under the due process clause,[199] an idea which seems almost entirely in conflict with its basic purpose. It is protection from the actions of the state that the due process clause is supposed to afford individuals.[200] If it is the state itself which is to decide what those protections are, then individuals will, in actuality, receive little or no protection at all.[201]

In addition, the results of this analysis may lead to other consequences which seem inappropriate in light of the Court's interests in

195. The authority and purpose of state legislatures and prison officials to enact legislation and regulations in order to "preserve internal order and discipline and to maintain institutional security," Bell v. Wolfish, 441 U.S. 520, 547 (1979), is well established. It is seen as "peculiarly [within] the province of the Legislative and Executive Branches of our Government . . . ." Id. at 548. As the Court noted: "the central objective of prison administration [and regulation is] safeguarding institutional security." Id. at 547. See also Pell v. Procunier, 417 U.S. 817, 823 (1974).

196. See supra note 192 and accompanying text.

197. See supra note 192 and accompanying text.

198. See Herman, supra note 6, at 552-55. See also Two Views, supra note 117, at 417.

199. It only follows that, if the formalistic analysis of statutory structure used by the Court can predicate the existence of a protected liberty interest on use of mandatory language, state legislatures could conceivably control the creation of protected liberty interests by the inclusion or exclusion of such. See Two Views, supra note 117, at 416-17.

200. See Kadish, supra note 72, at 340. See also Herman, supra note 6, at 552-55 (criticism of allowing legislatures to determine due process protections based on majoritarian value judgments). Justice Brennan notes in his dissent in O'Lone v. Estate of Shabazz, 482 U.S. 342 (1987): "The Constitution was not adopted as a means of enhancing the efficiency with which government officials conduct their affairs . . . [r]ather, it was meant to provide a bulwark against infringements that might otherwise be justified as necessary expedients of governing." Id. at 356 (Brennan, J., dissenting).

201. See Herman, supra note 6, at 553.

federalism[202] and deference to prison officials.[203] Such consequences may also interfere with prison officials' goals of providing regulations for the safe, orderly, and secure operation of prisons for both society and prisoners.

It is conceivable that the promulgation of prison regulations with sufficiently mandatory language and the requisite substantive predicates[204] might create a protected liberty interest. If this were to happen in an area generally regarded as within the day-to-day operations of prisons[205] and the expertise of prison officials,[206] the federal judiciary would have to interfere in order to protect those newly created constitutional rights. This would "involve the judiciary in issues and discretionary decisions that are not the business of federal judges."[207]

Furthermore, enactment of statutes and regulations may raise constitutional issues and "open[] the door to scrutiny by the federal courts."[208] As a consequence, states may choose not to enact statutes or regulations limiting official discretion in order to avoid the possibility of having to implement the procedural protections required by the due process clause.[209]

What seems counter-intuitive in the Court's analysis in *Thompson*,[210] and in many of the Court's other prisoners' due process cases, is its characterization and use of so-called "substantive predicates."[211] These are supposed to place limits on prison officials' discretion.[211] The existence of these substantive predicates is an essential element of the Court's current test for the existence of prisoners' protected liberty interests.[212] The reasoning behind the requirement of substantive

---

202. *See* Meachum v. Fano, 427 U.S. 215 (1976). "The federal courts do not sit to supervise state prisons, the administration of which is of acute interest to the States." *Id.* at 229 (citing Preiser v. Rodriguez, 411 U.S. 475, 491-92 (1973); Cruz v. Beto, 405 U.S. 319, 321 (1972); Johnson v. Avery, 393 U.S. 483, 486 (1969)). *See also The Supreme Court, supra* note 79, at 108.

203. *See* O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987).

204. *See supra* note 192 and accompanying text.

205. *See* Hewitt v. Helms, 459 U.S. 460, 470 (1983). The Court maintained that the "safe and efficient operation of a prison on a day-to-day basis has traditionally been entrusted to the expertise of prison officials . . . ." *Id.* at 470 (citing Meachum v. Fano, 427 U.S. 215, 225 (1976)).

206. *Id.*

207. Meachum v. Fano, 427 U.S. 215, 228-29 (1976).

208. Hewitt v. Helms, 459 U.S. 460, 471 (1983).

209. *Id. See also Prisoners' Rights, supra* note 117, at 181. "[T]he imposition of constitutional standards just because states have promulgated regulations for their prisons would inhibit experimentation and, possibly discourage regulations altogether." *Id.*

210. 109 S. Ct. 1904 (1989).

211. *Thompson*, 109 S. Ct. at 1909. *See* Board of Pardons v. Allen, 482 U.S. 369, 379-81 (1987); Hewitt v. Helms, 459 U.S. 460, 471-72 (1983).

212. *Thompson*, 109 S. Ct. at 1909. *See supra* note 192.

---

predicates is to provide "particularized standards or criteria [to] guide the State's decisionmakers [sic]."[213] This is contrasted with what the Court terms "'unfettered discretion'" by prison officials.[214] The distinction the Court makes is that only statutes with substantive predicates limiting official discretion (in addition to mandatory language) can give rise to a protected liberty interest. The Court reasons that without sufficient substantive predicates, decision-makers unfettered discretion would make it unreasonable for any expectation to arise from the statute sufficient to warrant the protections of due process.[215]

The problem with the Court's application of this analysis, and its requirement of substantive predicates, is that there is truly no inquiry into whether the criteria provided in the relevant statutes and regulations *actually* places any real limitation on the prison officials.[216] Some regulations held to provide adequate substantive predicates are quite specific and enumerate precisely what criteria the prison officials are to consider in their decision-making process.[217] Others contain merely a general statement of vague criteria, which essentially allow the decision-maker a great deal of discretion.[218]

The paradox in the Court's analysis is that it places a great amount of emphasis on the use of mandatory language,[219] however, the Court seems to make only a cursory review of the substantive predicates.[220] Nonetheless, it is the substantive predicates themselves that in reality will probably have more actual effect in limiting official discretion,

---

213. Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 467 (1981) (Brennan, J., concurring).

214. *Thompson*, 109 S. Ct. at 1909 (quoting Meachum v. Fano, 427 U.S. 215, 228 (1976)).

215. The Court requires that interests "must rise to more than 'an abstract need or desire'. . . and must be based on more than a 'unilateral hope.'" *Id.* at 1908 (citations omitted).

216. *See Thompson*, 109 S. Ct. at 1914. (Marshall, J., dissenting). *See also* Board of Pardons v. Allen, 482 U.S. 369, 383 (1987) (O'Connor, J., dissenting) (statute vesting broad discretion in parole board still created a liberty interest because of mandatory language); Hewitt v. Helms, 459 U.S. 460, 469-71 (1983) (Court only briefly inquired into the substantive predicates and found a liberty interest based on mandatory language). The Court does not examine any actual practices or results of the statutes and regulations, but strictly limits its inquiry to the wording and structure of the statutes. *Thompson*, 109 S. Ct. at 1909.

217. *Thompson*, 109 S. Ct. at 1906-07 nn.1-2.

218. *See* Board of Pardons v. Allen, 482 U.S. 369, 373-75 (1987).

219. *See Allen*, 482 U.S. at 377; *Thompson*, 109 S. Ct. at 1910; Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 11-12 (1978).

220. Board of Pardons v. Allen, 482 U.S. 369, 384 (1987) (O'Connor, J., dissenting). *See also Thompson*, 109 S. Ct. at 1910-11 (Court discussed adequacy of substantive predicates and found lack of mandatory language dispositive in destroying a liberty interest); Hewitt v. Helms, 459 U.S. 460, 471-72 (1983) (Court found mandatory language dispositive in creating a liberty interest).

rather than whether the statutes and regulations contain mandatory language.

It seems more probable that prisoners' expectations will arise more readily from statutes and regulations which list specific predicates on which official decisions will be based, rather than those which merely provide general guidelines. The latter allow prison officials to make decisions based on their own opinions and judgments,[221] As such, no one could reasonably predict or expect a particular outcome.

Since the basic premise of protected liberty interests deals with states creating expectations of liberty[222] among prisoners, it would seem logical for the Court's analysis to focus more on what expectations could actually arise, rather than a strict analysis of statutory language.[223] The formalistic approach the Court implements seems to have lost sight of the primary foundations upon which the theory of state created liberty interests is based.[224] The Court has chosen not to consider expectations that might arise from state practices, and limits its inquiry strictly to the content of the applicable statutes and regulations.[225] Consequently, the only remaining method available to assess whether the expectations of prisoners can arise is to examine the statutes' and regulations' substantive predicates. This analysis should focus on whether the substantive predicates *actually* place limits on official discretion, rather than focusing more and more on the existence of mandatory language.[226]

The Supreme Court's decision in *Thompson*[227] and other recent decisions,[228] however, focus almost entirely on the existence of the statutes' and mandatory language. There is no serious analysis of the statutes' and

---

221. *Allen*, 482 U.S. at 375.

222. *Thompson*, 109 S. Ct. at 1908. *See* Connecticut Board of Pardons v. Dumschat, 452 U.S. 458 (1981); *Cf.* Board of Regents v. Roth, 408 U.S. 564 (1972) (property interest arose out of expectations of state employment).

223. *See Thompson*, 109 S. Ct. at 1912 (Marshall, J., dissenting).

224. The whole premise on which state created liberty interests are based is the idea that state law can create liberty interests by virtue of individuals' reliance on expectations arising from statutes and regulations. *See supra* text and accompanying notes 12-14. *See also New Liberty, supra* note 6, at 550-52 ("[t]hat individual reliance is the logical underpinning of the entitlements theory is belied by the Court's recent focus on specific statutory language as the source of procedural entitlements").

225. *See supra* notes 125 and 128 and accompanying text. *See also* Iago v. Van Curen, 454 U.S. 14 (1981) (no liberty interest can arise other by statute regardless of any mutually explicit understandings that might stem from state practices).

226. *See Thompson*, 109 S. Ct. at 1914 (Marshall, J., dissenting); Hewitt v. Helms, 459 U.S. 460, 482 (1983) (Stevens, J., dissenting).

227. 109 S. Ct. 1904 (1989).

228. *See* Board of Pardons v. Allen, 482 U.S. 369 (1987); Hewitt v. Helms, 459 U.S. 460 (1983).

regulations' substantive predicates.[229] For example, in *Thompson* the regulations regarding visitation enumerated nine specific reasons for denying visitation.[230] The regulations also stated that visitation could be denied where a "visitor's presence . . . would constitute a clear and probable danger to the safety of the institution or would interfere with the orderly operation of the institution."[231] These quite specific criteria were considered adequate by the Court to constitute "specific substantive predicates."[232] They were found to sufficiently limit official discretion for the purpose of creating a protected liberty interest.[233] The Court reached this conclusion without a great deal of discussion or analysis. Despite the adequate substantive predicates, the Court found that no protected liberty interest arose because the regulations lacked the requisite mandatory language.[234]

In contrast, in *Board of Pardons v. Allen*[235] the relevant statute regarding parole eligibility predicated the granting of parole on the review board's opinions regarding a number of issues. These included: whether the prisoner could be released without being a detriment to the community,[236] whether the prisoner's release would be in the best interests of society,[237] and whether the prisoner would be a law abiding citizen.[238] These criteria, despite their generality and the broad discretion they vested in the parole board, were considered sufficient substantive predicates.[239] A protected liberty interest was found to exist in *Allen* primarily because of the statute's mandatory language, specifically, the use of the word "shall."[240]

Based on a comparison of the realistic expectations that might actually arise in prisoners from the statutes and regulations in both the *Thompson* and *Allen* cases, it seems that an expectation of a specific result is more likely to arise from the regulations in *Thompson*, than those in *Allen*.[241] The Court, however, did not engage in an analysis

---

229. *See Thompson*, 109 S. Ct. at 1911. *See also supra* text accompanying note 193.

230. *Thompson*, 109 S. Ct. at 1907 n.2.

231. *Id.*

232. *Id.* at 1910.

233. *Id.*

234. *Id.*

235. 482 U.S. 369 (1987).

236. *Allen*, 482 U.S. at 376.

237. *Id.*

238. *Id.* at 376-77.

239. *Id.* at 381.

240. *Id.* at 377, 381.

241. The visitation regulations in *Thompson*, 109 S. Ct. 1904, indicated that visitors could be denied visitation if they violated any one of a non-exhaustive list of nine criteria which would "constitute a clear and probable danger to the safety and security of the institution or would interfere with the orderly operation of the institution." *Id.* at 1907 n.2.



of what expectations might actually arise.[242] The Court continues to place a great amount of emphasis on mandatory language and merely engages in a token analysis of substantive predicates. There is no regard as to the possibility of any *actual* expectations.[243]

This approach, which focused entirely on the language of statutes, seems illogical considering the basic premises upon which the Court's protected liberty interest jurisprudence are founded.[244] It also seems inappropriate for the purposes of defining individual's rights under the due process clause of the fourteenth amendment. This untenable result is perhaps best described by Justice Stevens in his dissent in *Meachum v. Fano*,[245] "I had thought it self-evident that all men were endowed by their Creator with liberty as one of the cardinal unalienable rights. It is that basic freedom which the Due Process Clause protects, rather than the particular rights or privileges conferred by specific laws and regulations."[246]

### VII. CONCLUSION

The Supreme Court's decision in *Thompson*[247] represents a continued restriction of the due process rights of prisoners. It further demonstrates that protected liberty interests in prisoners will only arise

Those criteria specifically included: past records of disruptive conduct, being under the influence of alcohol, refusing to show identification or submit to a search, being related to an inmate's criminal behavior, being detrimental to an inmate's rehabilitation, being a former prisoner or prison employee visiting without permission, or having previously violated visiting procedures. *Id.* Regardless of the use of the words "shall" or "may," it is certainly possible, if not probable, that a prisoner would have a "legitimate expectation that visitors [would] be denied *only* when they fall within one of those categories." *Id.* at 1916 (Marshall, J., dissenting). In comparison, the statutes regarding parole decisions in *Board of Pardons v. Allen*, 482 U.S. 369 (1987), predicated the parole decision on relatively broad criteria based on the parole board's beliefs as to whether the prisoner could be released without detriment to the community, whether such would be in the best interests of society, and whether a prisoner would be a law-abiding citizen. *Id.* at 376. The amount of discretion granted by the statute was very broad and did not subject the decision-maker to any real restraint. *Id.* at 384 (O'Connor, J., dissenting). As a result, it would seem that in actuality no prisoner could form a reasonable expectation about any decision of the parole board. In light of the particularized nature of the regulations in *Thompson*, as compared with the broad and subjective criteria in the statute in *Allen*, a prisoner's expectation of a certain result would, in reality, be more likely to arise under the regulations in *Thompson*.
242. *See* Kentucky Dep't of Corrections v. Thompson, 109 S. Ct. 1904, 1914 (1989) (Marshall, J., dissenting); Jago v. Van Curen, 454 U.S. 14, 18-22 (1981); Connecticut Board of Pardons v. Dumschat, 452 U.S. 458, 465 (1981). *See also* Hewitt v. Helms, 459 U.S. 460 (1983); *supra* text accompanying note 187; Herman, *supra* note 6, at 550-52.
243. *See supra* note 192 and accompanying text.
244. *See* Herman, *supra* note 6, at 550-52.
245. 427 U.S. 215 (1976).
246. *Meachum*, 427 U.S. at 230 (Stevens, J., dissenting).
247. 109 S. Ct. 1904 (1989).

from state statutes and regulations. The Court continues to inquire into any actual prison practices. Neither will it consider whether any actual expectations of liberty on the part of prisoners arise. The Court now focuses, almost entirely, on the necessity of mandatory language.

The Court's emphasis on statutory construction, however, has become more of a semantic pretext for the Court to subjectively define the due process rights of prisoners based on their own judgments as to what interests warrant protection. It appears that the Court is, in actuality, more in line with Justice Marshall's view, and is considering the significance of the interest at stake. However, even though the Court is weighing the significance of the interests, its liberty interest decisions continue to be drawn in terms of the strict statutory approach.

Already, the consequences of the *Thompson* decision and its strict statutory analysis are being seen in federal court decisions on protected liberty interests.[248] Indeed, the use of the word "shall" in statutes and regulations has become the determinative factor in the creation of protected liberty interest.

The Court remains unwilling to recognize anything beyond a minimum of liberty interests arising from the due process clause itself. This, in effect, limits the liberty interests of prisoners to those interests conferred upon them by the states. This is an anomalous result considering the origins of the entitlements theory and the purpose of the protections provided for in the due process clause of the fourteenth amendment.

JOSEPH P. MESSINA

248. *See* Scalise v. Thornburgh, 891 F.2d 640 (7th Cir. 1989) (foreign prisoners had no liberty interest in international prison transfers without mandatory language in the regulations); Merritt v. Broglin, 891 F.2d 169, 174 (7th Cir. 1989) (summary judgment appropriate when lack of mandatory language in regulations prevented the creation of a liberty interest as a matter of law); Taylor v. Armontrout, 888 F.2d 555, 558 (8th Cir. 1989) (use of the word "shall" creates a liberty interest). *See also* Newsom v. Norris, 888 F.2d 371 (6th Cir. 1989) (prisoner's property interest will not arise outside of specific statutes and regulations).

§ 9:2                    RIGHTS OF PRISONERS, THIRD EDITION

prisoners[27] and to some state prisoners.[28]

Given the overcrowding in many state prisons, and the temporary solution being followed in many states of housing state prisoners in county jails, it was perhaps inevitable that a case such as *Bryan v Department of Corrections*[29] would be decided. There, a state prisoner, who was being housed in a county jail, was the subject of a disciplinary action for violating rules and regulations that expressly stated that they were applicable only to state prison facilities. The court held this fact did not render the disciplinary proceeding invalid. Nonetheless, the court did not hold that the sanctions that could be imposed against state prisoners housed in county jails could not exceed those provided for in the county jail regulations, in the absence of proof to the contrary that the prisoner has been notified that the more restrictive sanctions used in state prisons would apply to prisoners housed in county jails.

## § 9:3    The Supreme Court's Treatment of When Due Process Is Required

Before examining the procedures required by due process in a prison disciplinary proceeding, we must first discuss when due process attaches to prison disciplinary proceedings. Under the Fourteenth Amendment an inmate is entitled to due process procedural protections only when prison officials move to deprive him or her of a liberty or property interest protected by the Fourteenth Amendment. If prison officials impose punishments that do not deprive inmates of a liberty or property interest there is no right to procedural protections, and prison officials, as a constitutional matter, may or may not provide whatever procedures they wish. It is

---

[27]28 CFR § 541.11(d). See also U.S. Dept of Justice, Federal Standards for Prisons and Jails 8.08, 10.01, 10.02 (1980) (reprinted in Appendix C).

[28]See, e.g., NY Corrections Law § 138(3).

[29]Bryan v. Department of Corrections, 258 N.J. Super. 546, 610 A.2d 889 (App. Div. 1992).

112

---

DISCIPLINARY PROCEEDINGS                    § 9:3

thus critically important as an initial step in the analysis to know whether the punishment imposed is one for which the constitution requires procedural protections.

The United States Supreme Court has addressed this issue as frequently as any other in the prisoners' rights field. The cases reveal a Court that has attempted more than one solution to the problem of when due process attaches to prison disciplinary proceedings. In this section we briefly describe these cases culminating with *Sandin v. Conner*, currently the major decision and the one that lays out the approach that must now be followed.

### *Wolff v. McDonnell*

The initial prison discipline case decided by the Supreme Court, *Wolff v McDonnell*,[1] involved the loss of good time credits. Good time credits, when earned, shorten the amount of time that an inmate must serve in prison. Because a state statute created a right to good-time credits, the *Wolff* court held that the right to good-time credits fell within that "liberty" interest embraced by the Fourteenth Amendment. Accordingly, the prisoner was held entitled to the protections of due process before good-time credits could be taken away. In a footnote, the court added that, while its decision technically addressed only the deprivation of good time, the same due process safeguards would be applicable to the imposition of solitary confinement as well.[2]

It was at this point, however, that the majority

---

[Section 9:3]

[1]Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

[2]*Id.* at 571 n.19. It is interesting to note that the Court did not ask whether there was a "right" to be free of solitary confinement. Rather, the Court found only that solitary confinement "represents a major change in the conditions of confinement and is normally imposed only when it is claimed and proved that there has been a major act of misconduct." See also Crooks v. Warne, 516 F.2d 837 (2d Cir. 1975); Powell v. Ward, 392 F. Supp. 628 (S.D. N.Y. 1975),

113