seemed to draw the line, stating that it did not intend to suggest that the procedures mandated by the decision would also be required for the imposition of lesser penalties, such as the loss of privileges.[3] The court did not define what constituted a "privilege" and did not suggest what, if any, procedures were constitutionally required when such lesser penalties are imposed. Lower courts, thus, were left to grapple with the difficult question of when (and what) due process safeguards are necessary in cases falling, on the one hand, between loss of good time or solitary confinement, and, on the other hand, loss of mere privileges.

### Meachum v. Fano

Meachum v. Fano,[4] is the second case. It involved an interprison transfer from one prison to another arguably for breaking a prison rule.[5] The inmate argued that since the purpose of the transfer was punitive to punish him for violation of prison rules he was entitled to the due process procedural protections laid out in Wolff. The Court began its analysis by rejecting the argument that "any grievous loss visited upon a person by the State" or "... any change in the conditions of confinement having a substantial adverse impact on the prisoner involved is sufficient to invoke the proce-

order modified on other grounds, 542 F.2d 101 (2d Cir. 1976); Martino v. Carey, 563 F. Supp. 984 (D. Or. 1983).

[3]Wolff v. McDonnell, 418 U.S. 539, 571 n.19, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). See also Greene v. Secretary of Public Safety and Correctional Services, 68 Md. App. 147, 510 A.2d 613 (1986) (Wolff inapplicable where punishment is confinement to cell for duration of a shift lasting no more than eight hours). But see Ward v. Johnson, 667 F.2d 1126 (4th Cir. 1981), on reh'g, 690 F.2d 1098 (4th Cir. 1982) (applying Wolff where the prisoner had lost only recreational opportunities, the court stated that the potential punishment imposible rather than the actual punishment imposed determines the applicability or inapplicability of due process).

[4]Meachum v. Fano, 427 U.S. 215, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976), discussed at greater length in Ch 10.

[5]See, generally, Ch. 10.

dural protections of the Due Process Clause.'"[6] A convict's liberty interest, reasoned the Court, is extinguished to the extent that a state may confine him in any of its prisons.[7] Because prisoners have no right to placement in any particular institution, they also have no basis for complaint when transferred from one prison to another.[8] In other words, no liberty interest is implicated by such a transfer.[9] According to the Meachum Court, the fact that life in one prison is more disagreeable than in another is not a sufficient Fourteenth Amendment interest to warrant a due process hearing.[10]

The court in Meachum distinguished Wolff on the ground that the loss of good-time credits, at stake in Wolff, was created by state statute." As such, it qualified as a liberty interest protected by the Constitution.[12] There was, in Meachum, no corresponding statutory or constitutional right to remain in the institution to which the prisoner was initially assigned, conditioned only on proof of specific acts of misconduct.

Thus, it appears from Meachum and Wolff that the

[6]Meachum v. Fano, 427 U.S. 215, 224, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976).

[7]Id.

[8]Id. at 224-25. However, in Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822 (1st Cir. 1987), a prisoner had been transferred for disciplinary reasons. The court found that a liberty interest in the timing of a post-transfer hearing had been created by the state regulation's mandatory language. In that case, since the post-transfer hearing had not been held within the time prescribed by the regulation, the prisoner's due process rights had been violated, and damages would be payable if liability could be assigned.

[9]The Fourteenth Amendment protects only "life, liberty, and property" interests from being taken without due process of law.

[10]Meachum v. Fano, 427 U.S. 215, 225-26, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976). Accord, Johnson v. Barry, 815 F.2d 1119 (7th Cir. 1987).

[11]Meachum v. Fano, 427 U.S. 215, 226, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976).

[12]Id.

§ 9:3 RIGHTS OF PRISONERS, THIRD EDITION

Court was decreeing that due process protections are necessary at least (but perhaps only) when rights are threatened which are either created by statute, by state or federal regulation, or by an express provision of the Constitution. The Due Process Clause does not, by its own force, require procedural protections before an inmate may be punished for a breach of prison rules.[13] What is important are the rights to which prisoners are legally entitled and not the impact of the official's action on the inmate.[14]

### Vitek v. Jones and Washington v. Harper

*Vitek v Jones*[15] introduced a new theory for determining when due process protections attach. In that case

[13]Montanye v. Haymes, 427 U.S. 236, 242, 96 S. Ct. 2543, 49 L. Ed. 2d 466 (1976). See also Quam v. Minnehaha County Jail, 821 F.2d 522, 523 (8th Cir. 1987):

The Due Process Clause itself provides no protection against administrative segregation of inmates and creates no entitlement to a particular level of privileges in a prison or jail. Quam's entitlement to privileges can only arise from a liberty interest created by state statutes, regulations, or official policies.

No such liberty interest was found in this case.

[14]See also Olim v. Wakinekona, 461 U.S. 238, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983) (holding that a transfer from one prison system to another did not implicate a liberty interest of the prisoner). See, generally, Gooding, The Impact of Entitlement Analysis: Due Process in Correctional Administrative Hearings, 33 U Fla L Rev 151 (1981); Comment, Two Views of a Prisoner's Right to Due Process: Meachum v Fano, 12 Harv CR-CL L Rev 405 (1977). In a dissenting opinion in Bell v. Wolfish, 441 U.S. 520, 579, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979), Mr. Justice Stevens noted that the *Wolfish* majority had, in effect, rejected the view that a due process liberty interest encompassed only those rights created by statute, regulation, or the Bill of Rights. Instead, according to the dissent, the *Wolfish* Court expanded the concept of a liberty interest to include the right to be free of punishment without a prior adjudication of guilt. The source of this liberty interest was the Due Process Clause itself.

[15]Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980); D. Kite, Competent Help Required in Involuntary Transfer of State Prisoners to Mental Institutions, 12 Tex Tech L Rev 516,

DISCIPLINARY PROCEEDINGS § 9:3

the Supreme Court confronted the question of whether transfers from prison to a mental institutional implicated the liberty interests of the affected inmate. Jones had been convicted of robbery and sentenced to prison. While in solitary, he set fire to his mattress, severely burning himself. Thereupon, the state prison officials ordered that Jones be transferred to a mental hospital, pursuant to a statute that permitted transfers of a prisoner to a mental institution on a finding by a physician or psychologist that the prisoner suffered from a mental disease or defect that could not be properly treated in the facility.[16]

The Court held that the inmate was entitled to due process. The court gave two reasons for this conclusion. First, the state statute created in the prisoner an expectation that he would not be transferred unless he suffered from a mental disease or defect that could not be adequately treated in the prison.[17] Had the Court stopped at that point, its decision would have been unremarkable, for in *Wolff* the Court had had established the theory that liberty interests could be created by state statute.[18]

The significance of *Vitek* is that the Court advanced an alternative basis for its conclusion. Rejecting the state's argument that the transfer involved only a change in the place of confinement, the Court pointed out that although conviction does extinguish a prisoner's right to freedom from confinement, it does not constitute a determination that a convicted person is mentally ill nor can it, without more, be used to confine a prisoner

516-39 (1981); L. Graetz, Prisoners Rights: Due Process and Transfers to Mental Institutions, 32 U Fla L Rev 770, 770-84 (Summer 1980); Note, Vitek v Jones: Transfer of Prisoners to Mental Institutions, 8 Am J L & Med 175 (1982).

[16]The relevant statute, Neb Rev Stat § 83-180(1), is reprinted in note 1 of the Supreme Court's opinion.

[17]Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 1261-62, 63 L. Ed. 2d 552 (1980).

[18]Wolff v. McDonnell, 418 U.S. 539, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974).

to involuntary institutional care in a mental hospital.[19] Such a consequence, said the majority, was "qualitatively different from the punishment characteristically suffered by a person convicted of crime."[20] In further support of its conclusion that a liberty interest was implicated, the Court cited the stigmatizing consequences of being labeled mentally ill[21] and the fact that Jones had been subjected to a mandatory behavior modification program in the mental institution.[22]

In *Washington v. Harper*,[23] the Supreme Court took a similar approach in holding that before forced administration of psychotropic medication is administered to an inmate there must be due process procedures.

### Hewitt v. Helms

In *Hewitt v. Helms*,[24] the Supreme Court held that the transfer of an inmate to the less amenable and more restrictive confines of administrative segregation did not

---

[19]Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 1264, 63 L. Ed. 2d 552 (1980).

[20]*Id.* at 1264.

[21]*Id.* at 1263-64. The Supreme Court had previously appeared to vacillate on the question of when the imposition of a social stigma rises to a level requiring due process safeguards. Compare Paul v. Davis, 424 U.S. 693, 96 S. Ct. 1155, 47 L. Ed. 2d 405 (1976) with Wisconsin v. Constantineau, 400 U.S. 433, 91 S. Ct. 507, 27 L. Ed. 2d 515 (1971). See also Flowers v. Coughlin, 551 F. Supp. 911 (N.D. N.Y. 1982).

[22]Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 1263-64, 63 L. Ed. 2d 552 (1980). Lower courts have also recognized other potential "liberty" interests involved in the transfer of a prisoner to a mental hospital. See also Quintero v. Encarnacion, 242 F.3d 390 (10th Cir. 2000) (liberty interest in being free from involuntary administration of psychotropic drugs) and also Jurasek v. Utah State Hosp., 158 F.3d 506 (10th Cir. 1998); U.S. v. Frierson, 208 F.3d 282 (1st Cir. 2000) (social stigma even in prison community).

[23]Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990).

[24]Hewitt v. Helms, 459 U.S. 460, 476 n.8, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983).

---

per se implicate a liberty interest, for such a transfer was within the terms of confinement contemplated by a prison sentence. Freedom from administrative segregation is simply not an interest independently safeguarded by the Due Process Clause.[25] Nonetheless, the Court in *Helms* found that a protected liberty interest in remaining in the general prison population had been created in that case by state statutes and regulations explicitly mandating specific substantive predicates before an inmate could be transferred to administrative segregation.[26]

Having decided this issue in the prisoner's favor, however, the Court proceeded to reject the argument that, under these circumstances, due process required the full range of procedural protections contemplated in *Wolff*. Rather, said the Court, all that was necessary was an informal, nonadversary review of the information supporting the decision to transfer the inmate to administrative segregation, including whatever statement the inmate desired to submit, within a reasonable time after confinement to administrative segregation. The Court reached this conclusion by balancing the private interests at stake, the government interests involved, and the value of procedural requirements in elucidating the issues. The Court found the prisoner's private interests to be minimal, since he was simply transferred from one restrictive environment to a more restrictive one, suffered no stigma from confinement in administrative segregation, and did not have his prospects for parole affected in any significant way. On the other hand, the Court found the governmental interests at stake-the safety of other inmates and prison officials, the security of the institution, and the need to separate the inmate from the general population pend-

---

[25]See also Quam v. Minnehaha County Jail, 821 F.2d 522 (8th Cir. 1987).

[26]See also Layton v. Beyer, 953 F.2d 839 (3d Cir. 1992); Conti v. Dyer, 593 F. Supp. 696 (N.D. Cal. 1984); Perez v. Neubert, 611 F. Supp. 830 (D.N.J. 1985).

ing investigation of serious charges—to be of great importance. Finally, the Court found that a detailed adversary proceeding would not materially assist determination of the issues involved. After balancing these factors, the Court outlined more specifically the requirements of due process in this context:

An inmate must . . . receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decision maker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied.[27]

### Kentucky Department of Corrections v. Thompson

*Kentucky Department of Corrections v. Thompson*[28] delved further into the realm of state-created liberty interests. In that case the Court held that even if there

---

[27]Hewitt v. Helms, 459 U.S. 460, 476, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). In a footnote, the Court added that the "proceeding must occur within a reasonable time following an inmate's transfer, taking into account the relatively insubstantial private interest at stake and the traditionally broad discretion of prison officials." Hewitt v. Helms, 459 U.S. 460, 476 n8, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983). See Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822 (1st Cir. 1987). *Hewitt* is discussed in Robertson, The Constitutional Rights of an Inmate at an Administrative Segregation Proceeding: Hewitt v Helms and the Withdrawal of Prisoners' Rights, 11 Ohio NUL Rev 57 (1984); Jones & Rhine, Due Process and Prison Disciplinary Practices: From Wolff to Hewitt, 11 New Eng J Crim & Civ Confinement 44 (1985); Case-note, The Procedural Due Process Implications of Involuntary State Prisoner Transfers: Hewitt v Helms and Olim v Wakinekona, 25 BCL Rev 1087 (1984); Case Comment, Liberty within Prison Walls as a Natural Right, 11 New Eng J Crim & Civ Confinement 217 (1985).

[28]Kentucky Dept of Corrections v Thompson, 490 U.S. 454, 461 (1989).

---

is no independent constitutional right to visiting, a right might be created as a constitutionally protected liberty interest under state law. The Court held that this occurs whenever state law, either by statute or regulation, creates a no discretionary entitlement. If that occurs the Court indicated there is a liberty interest that cannot be extinguished without providing procedural due process protections.[29]

*Thompson* was a prison visiting case that dealt with whether there is a procedural due process right to a hearing prior to the suspension of visiting rights. The state regulations, which were approved in a federal court consent decree, provided that defendants would continue "to maintain visitation at least at the current level, with minimal restrictions"[30] and that visitors "may be excluded" when officials find reasonable grounds to believe that "the visitor's presence in the institution would constitute a clear and present danger to the institution's security or interfere with [its] orderly operation."[31]

The Supreme Court held that for visiting to become an enforceable state-created liberty interest, it was necessary "to examine closely the language of the relevant statutes and regulations."[32] If the language places "substantive limitations on official discretion," then a liberty interest is created, which cannot be taken away without due process protections.[33] To determine whether the state rule imposes "substantive limitations," a court must examine the wording of the rule for "explicitly mandatory language" mandating a certain result if

---

[29]*Id.* See also Board of Pardons v. Allen, 482 U.S. 369, 107 S. Ct. 2415, 96 L. Ed. 2d 303 (1987).

[30]*Id.* at 456.

[31]*Id.* at 463.

[32]*Id.* at 461.

[33]*Id.* at 462 (quoting Olim v. Wakinekona, 461 U.S. 238, 247, 103 S. Ct. 1741, 75 L. Ed. 2d 813 (1983)).

specified conditions are met.[34]

In *Thompson*, the Court found that the state visiting regulation did not create a liberty interest because the verbiage that a visitor "may be excluded"[35] lacked the "relevant mandatory language."[36] However, the Court's reasoning suggests that if a state statute dealing with an privilege is mandatory in nature in such a manner that an inmate reading it could "reasonably form an objective expectation that a visit would necessarily be allowed absent the occurrence of one of the listed conditions," then a constitutionally protected right would have been created.[36]

## *Sandin v. Conner*

In *Sandin v. Conner*,[37] the United States Supreme Court by bare majority in a 5 to 4 opinion altered the landscape of prison disciplinary law. As we have seen prior to *Sandin*, the Court's decisions delineated two methods for determining whether an inmate had been deprived of a liberty interest which required procedural due process protection. First, as in *Vitek* where the deprivation of the interest was recognized by state law. Second, as in *Wolff*, *Hewitt*, and *Thompson* where the deprivation divested the inmate of an entitlement established by state law. In *Sandin*, the Court substantially modified the second approach so that state

---

[34]*Id.* at 463 (quoting Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983)).

[35]*Id.* at 463-64.

[36]*Id.* at 465. One caveat to this point should be noted. In Thompson, the state argued that liberty interests should only be created by state law in the prison context when they affect the duration of a person's prison term. Since visiting regulations do not have that effect, defendants argued that regardless of the mandatory nature of the language in the regulation, a liberty interest could not be created. The Court refrained from considering that issue but left it open to be argued in a latter case. *Id.* at 461 n3.

[37]Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).

---

laws and regulations that had in the past created liberty interests may no longer do so unless as a result the inmate is subjected to an "atypical and significant hardship" beyond that which is generally inherent in the "ordinary incidents of prison life."[38] This new test imposes an additional hurdle for inmates to overcome to establish a constitutional right to procedural due process protection.

Conner, an inmate serving a 30-year-to-life indeterminate sentence, was sentenced to 30 days in punitive segregation for allegedly interfering with prison officials during a strip search. He brought suit in federal court challenging the refusal of prison officials to allow him to call witnesses at his hearing. The Ninth Circuit reversed the dismissal of his complaint holding that since the provisions of Hawaii law governing the use of punitive segregation created a liberty interest, he was entitled to procedural safeguards at his hearing.

The Supreme Court reversed. The majority opinion written by Chief Justice Rehnquist criticized the manner in which previous decisions especially *Hewitt* had determined state-created liberty interests. By focusing solely upon the wording of prison rules to determine whether or not a liberty interest had been created, Chief Justice Rehnquist said that two "undesirable effects" have resulted. First, states have avoided creating clear uniform rules regulating prison conduct for fear that they might create liberty interests which will subject them to federal judicial review. In order to avoid litigation by inmates prison officers thus lose the benefit of achieving more accountability in their management of the institutions. Second, the approach has led federal courts to over involve themselves in the day-to-day management of prisons. The Court, in particular, pointed to lower court decisions holding within the protection of the constitution such mundane matters as whether or not an inmate could be given a snack lunch

---

[38]*Id.* at 2300.



rather than a tray lunch.[39]

To avoid these difficulties, the Court held that henceforth liberty interests justifying procedural due process protections could be created only in two situations. First, when independent of state law a deprivation exceeds the prisoner's sentence in an unexpected manner and, second, when state law of a mandatory character imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."[40]

In *Sandin*, neither condition was met. Although the plaintiff was subjected to punitive segregation for punishment that fact alone was not sufficient. "Discipline by prison officials in response to a wide range of misconduct falls within the expected parameters of the sentence imposed by a court of law."[41]

Moreover, the conditions of disciplinary confinement imposed upon plaintiff did "not present a dramatic departure from the basic conditions of [his] indeterminate sentence."[42]

Even though the plaintiff was confined 23 hours a day to his cell, prisoners in the general population were also confined to their cells for substantial periods of 12 to 16 hours per day. In addition, the Court noted that the State had expunged plaintiff's record for the infraction after he had served the time in segregation. Thus, the Court was able to conclude that the action of finding him guilty of the infraction did not present a situation which would "inevitably effect" a latter decision to grant or to deny him parole.[43]

Justices Ginsburg and Breyer filed separate dissents that were joined in by Justices Stevens and Souter respectively. Justice Ginsburg agreed with the majori-

[39]*Id.* at 2308.
[40]*Id.*
[41]*Id.* at 2301.
[42]*Id.*
[43]*Id.*

124

ty's criticism of state-created liberty interests, but took the position that confinement in disciplinary segregation is a grievous loss which deprives inmates of "privileges for protracted periods" and which "stigmatizes them and diminishes parole prospects."[44] Therefore, a liberty interest is involved independent of the wording of a particular state law.

Justice Breyer adhering to the concept of state-created liberty interests, differed with the Court on the use of its new "atypical and significant" test. Justice Breyer wrote that the case need not make a major change in the law. In his view, the new standard, properly applied, will merely remove "minor prison matters from federal court scrutiny."[45] This is so because the opinion merely affirmed the concept implicit in the Court's prior decisions, that "unimportant matters that happen to be the subject of prison regulations" are not guarantees to inmates of a "right," but rather "instruction to the administrator about how to do his job."[46] By contrast, prison rules that go beyond regulation of the ordinary incidents of prison life, and specify behavior expected of an inmate to avoid punishment normally do create liberty interests.

Given the control that officials have over inmates' lives, and the unbridled power that a broad reading of the majority opinion would give, this reading of the majority's "tea leaves" makes a great deal of sense. However, the majority's holding that Conner's 30-day confinement in punitive segregation was not either "atypical" or "significant" suggests the possibility of another approach which could substantially limit the reach of the due process protections available to prisoners.

How such a major change will work remains to be seen. As Justice Ginsburg pointed out, the majority gives no clear guidance about what is and what is not

[44]*Id.* at 2302.
[45]*Id.* at 2306.
[46]*Id.* at 2308.

125



an atypical and significant hardship sufficient to trigger due process protections. The lack of definition "leave[s] consumers of the Court's work at sea, unable to fathom" what is sufficient.[47]

*Sandin* has been criticized as "vastly narrowing the ability of prisoners to draw upon state positive-law sources . . . [which as a result has] left a litany of arguably compelling interests defenseless in the face of unfettered administrative discretion."[48] Until the

[47] *Id.* at 2303. See also John Boston, Highlights of Important Cases: Disciplinary Due Process, 10 Nat'l Prison Project J 5, 7 (1995) ("The practical meaning of 'atypical and significant hardship' is far from clear").

[48] Philip W. Sbaratta, *Sandin v. Conner*: The Supreme Court's Narrowing of Prisoners' Due Process And the Missed Opportunity to Discover True Liberty, 81 Cornell L. Rev. 744, 746 (1996). *Sandin* has stimulated a vast literature. See, e.g., Julia M. Glencer, Comment, An "Atypical and Significant" Barrier to Prisoners' Procedural Due Process Claims Based on State-Created Liberty Interests, 100 Dick L Rev 861 (1996).

For a sampling of the extensive commentary on *Sandin*, see, e.g., Barbara Belbot, in Can A Prisoner Find a Liberty Interest These Days? The Pains of Imprisonment Escalate, 42 NYL Sch L Rev 1 (1998); Quan Luong, Casenote, Sandin v. Conner: Prisoners' Rights and State-Created Liberty Interests: Has the Court Come Full Circle?, 7 Geo Mason U Civ Rts LJ 25 (1997); Symposium, A Prisoner's Threshold for Procedural Due Process After Sandin v. Conner: Conservative Activism or Legitimate Compromise, 33 Hous L Rev 1521 (1997); Michelle C. Ciziak, Sandin v. Conner: Locking Out Prisoners' Due Process Claims, 45 Cath U L Rev 1101 (1997); Christopher Meyer, Objective Expectations, Liberty Interests, Official Discretion: Sandin Considered in Light of Colorado Inmates Facing Administrative Segregation, 68 U Colo L Rev 229 (1997); Colleen Tracy, Constitutional Law Fourteenth Amendment State-Created Procedural Due Process Liberty Interests Are Limited to Freedom From Restraint When Prison Regulations Do Not Unexpectedly Exceed The Sentence But Impose Hardship on the Inmate in Relation to Ordinary Incidents of Prison Life Sandin v. Conner, 27 Seton Hall L Rev 772 (1997); Scott F. Weisman, Note, Sandin v. Conner: Lowering The Boom on the Procedural Rights of Prisoners, 46 Am U L Rev 897 (1997); Symposium, Drawing The Iron Curtain: Prisoners' Rights From Morrisey v. Brewer to Sandin v. Conner, 72 Chi-Kent L Rev 923 (1997) and see James

Supreme Court returns to this issue it has been left as we see in the next section of this chapter to the lower courts where the line will should be drawn, and how *Sandin* will be applied over the broad range of judgments which affect prisoners such as classification, parole release, and good time decisions, and even decisions involving punitive segregation in situations which differ from the facts of *Sandin*.

## Summary

The Supreme Court opinions in this area have not marked a straight line. Indeed, the approach the Court initially took has now been substantially revised. Before *Sandin* to protect inmates from arbitrarily imposed punishments the Court relied heavily on the notion of state-created liberty interests. Under this theory when a state rule or regulation contained mandatory language providing an entitlement to a particular right or privilege the inmate could not be deprived of that entitlement without due process protections.

The logic of the approach suggests that, to the extent legislatures give prison officials little statutory guidance in running the prisons, the officials are not bound to accord significant due process safeguards. On the other hand, if a state legislature, concerned with unbridled administrative discretion, takes an active role in circumscribing the discretion of prison officials, due process will be required if the legislature's commendable efforts have given prisoners any statutory rights which can be taken away for disciplinary reasons. The ironic result of the approach is that, where the

E. Robertson, The Decline of Negative Implication Jurisprudence: Procedural Fairness in Prison Discipline After Sandin v. Conner, 32 Tulsa LJ 39 (1996); Deborah R. Stagner, Sandin v Conner: Redefining State Prisoners' Liberty Interest and Due Process Rights, 74 NCL Rev 1761(1996); Michelle C. Ciszak, Sandin v Conner: Locking Out Prisoners Due Process Claim, 45 Cath UL Rev 1101 (1996); Note, Prisoner's Rights: Punishments Imposed by Administrative Proceedings, 109 Harv L Rev 141 (1995).

§ 9:3

potential for arbitrariness is greatest because of lack of legislative guidance, no procedural checks are available; but, where prison officials are already limited by legislative checks, they are further subject to judicially imposed due process. Thus, due process is prescribed where needed least and denied where needed most.

The Court's pre-*Sandin* approach also allows either the legislative or executive branch of government to insulate prison disciplinary proceedings from judicial review on the issue of procedural due process. The legislature can do so by not creating statutory entitlements in prisoners. If some important prison necessity, for example, exists as a matter of administrative grace rather than statutory right, an inmate would not be protected from its deprivation by due process protection no matter how arbitrarily the state officials acted. The patently bizarre result would follow that if two prisoners, A and B, were each accused of violating rule X on the same set of facts, and each was found guilty in a hearing devoid of all due process protections, but A was punished by the loss of a statutorily created interest while B was punished by the loss of a discretionary administrative interest, A could successfully challenge the failure to be provided due process safeguards, but B could not. This same result would follow even if it were universally agreed that the sanctions imposed on B were considerably harsher than those imposed on A.

Thus, the Court's approach prior to *Sandin* was justifiably subject to criticism. The Court could have responded to this criticism by recognizing that inmate should have freedom from arbitrary decision making as an independent liberty interest.[44] Such a holding would not necessarily have changed the ultimate result in a particular case, however, since the guarantee of

---

[44]See, generally, Van Alstyne, Cracks in "The New Property": Adjudicative Due Process in the Administrative State, 62 Cornell L Rev 445 (1977). For an incisive critique of the Court's narrow approach to the concept of liberty, see Herman, The New Liberty: The Procedural Due Process Rights of Prisoners and Others under the Burger Court, 59 NYU L Rev 482 (1984).

---

§ 9:4

procedural safeguards is no guarantee that one will prevail on the merits. Procedural protections serve only to increase the likelihood of an accurate result. Nor would recognition of freedom from arbitrary decision-making have prevented the Court from taking into account the exigencies of prison life in determining what process is due.[45] However, rather than take that turn, the one vote majority in *Sandin* took the Court in the opposite direction, one that significantly narrows the circumstances under which due process protections are required.

Until it changes its opinion, to obtain due process protections inmates will need to show either (1) that the deprivation that is being imposed by prison officials is outside the range of deprivations expected and/or authorized by of a normal criminal conviction, or (2) the deprivation is of a right that is a state-created liberty interest which works "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

It is left to the lower courts to give meaning to these phrases. We now turn to the law that has developed elucidating both means of establishing a liberty interest sufficient to trigger due process protections.

## § 9:4 —When Due Process Is Required:
### Deprivations Outside the Normal Range of Prison Sentence and Criminal Conviction

In *Sandin*, the Court recognized that the Due Process Clause of "its own force" protects against the arbitrary infliction of severe deprivations upon prisoners by prison officials.[1] This means that in certain very limited situations that even if the deprivation is not a state-created liberty interest there still may be due process

---

[45]See § 9.5.

[Section 9:4]
[1]Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2300, 132 L. Ed. 2d 418 (1995).

procedural protections required. To qualify for this category the deprivation must be particularly harsh. In the Court's words it must be "qualitatively different" from the punishment characteristically suffered by a person convicted of crime."[2] Another way the Court expressed this thought is by saying that the deprivation must exceed "the sentence in such an unexpected manner as to give rise to protection of the Due Process Clause of its own force."[3]

The Sandin Court pointed to two illustrations of this from its prior cases, transfer from a prison to a mental facility and forced administration of psychotropic drugs.[4] Two other situations in which the Court has indicated that due process protections are available irrespective of whether or not there is a state-created liberty interest are revocation of probation[5] and revocation of parole status.[6] Another example of this is found in the Ninth Circuit, which held that labeling an inmate a sex offender which is comparable to a commitment to a mental institution.[7] These examples are not exclusive. Other punishments would fit if they meet the standards specified above.[8] Of course, punishments that exceed the strictures of the Eighth Amendment would also qualify although regardless of the process imposed these punishments may not be inflicted.

---

[2] Id. at 2297.

[3] Id. at 2300.

[4] Id. (citing Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980) and Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990)).

[5] Gagnon v. Scarpelli, 411 U.S. 778, 93 S. Ct. 1756, 36 L. Ed. 2d 656 (1973).

[6] Morrissey v. Brewer, 408 U.S. 471, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972).

[7] Neal v. Shimoda, 131 F.3d 818 (9th Cir. 1997).

[8] See, e.g., Williams v. Benjamin, 77 F.3d 756 (4th Cir. 1996) (four point restraints constituted significant deprivation).

---

### § 9.5    —When Due Process is Required: State-Created Liberty Interests which When Denied Impose Atypical and Significant Hardships

The Supreme Court in Sandin criticized the Hewitt Court's reliance on state statutes exclusively as a means to determine whether or not due process protections are required. Therefore, it added the additional requirement of an atypical and significant hardship. Under this approach the second — and most common way — in which entitlement to due process protections are created after Sandin is when there is a state-created liberty interest which when denied imposes atypical and significant hardships beyond the "ordinary incidents of prison life."[1]

To establish the right to due process protections under this test two showings must be made: (1) that there is a state-created liberty interest and (2) that it is designed to protect against atypical and significant hardships.[2]

### State-Created Liberty Interests

A state-created liberty interest arises when the state through a statue, or regulation creates "mandatory rules and regulations to govern disciplinary proceedings."[3] This can occur when the state in its statutes, rules or regulations "uses words like 'will,'

---

**[Section 9:5]**

[1] Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2299, 132 L. Ed. 2d 418 (1995).

[2] See Columbia Human Rights Law Review, A Jailhouse Lawyer's Manual, 622 (5th ed 2000) ("To establish the right to due process protections an inmate 'must show (1) the state used mandatory language in its relevant statute or regulation, thus creating a liberty interest, and (2) the punishment'. . . endured constituted an 'atypical and significant hardship.'").

[3] Id. at 623.

'shall,' or 'must'"[4] The words themselves are not sufficient; what is required is that the words in the context in which they are used give rise to a reasonable expectation that if certain non-discretionary conditions are met the inmate will receive a particular entitlement or be free from a particular restraint. In order to find that a statute or regulation creates a liberty interest, a court has to decide whether "the use of explicitly mandatory language," in connection with the establishment of 'specified substantive predicates' to limit discretion means that the statute creates in the inmate a justifiable expectation that if the terms of the law or regulation are met that the benefits provided will be provided."[5] Under this analysis courts considering the existence of an alleged liberty interest must ascertain whether "statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates."[6]

An example of this kind of issue in cases dealing with whether 28 CFR § 541.22, a Federal Bureau of Prisons regulation about administrative segregation is a "state-created liberty interest." The regulation specifies that:

Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO (Segregation Review Official). Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate

---

[4]Id.

[5]See Kentucky Dept. of Corrections v. Thompson, 490 U.S. 454, 463, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989).

[6]Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir. 1999) (quoting Hewitt v. Helms, 459 U.S. 460, 471-72, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983)).

---



from administrative detention when reasons for placement cease to exist.[7]

The courts have split on whether this regulation creates a liberty interest. Some courts found that the regulation is not specific enough to create a liberty interest.[8] However, other courts disagree.[9] In finding that the regulation did create a liberty interest the Second Circuit found that the regulation was "replete with words such as "shall," "unless," and "only."[10] The court found that this language, while not dispositive, does indicate that the "Bureau of Prisons intended to guide the decision making power of prison officials by requiring that certain prerequisites be met and certain procedures be followed whenever a prisoner was subject to segregated housing."[11] The analysis that it was a liberty interest was supported by the language of the statute that "[t]he SRO shall release an inmate from administrative detention when reasons for placement ceases to exist." (emphasis supplied).[12]

The court agreed that while the initial decision to

---

[7]Telier v. Fields, 280 F.3d 69 (2d Cir. 2000) (citing 28 CFR § 541.22 (c)(1)).

[8]See, e.g., Crowder v. True, 74 F.3d 812, 815 (7th Cir. 1996) (per curiam) ("We . . . hold that § 541.22 does not create a constitutionally protected liberty interest"); Moore v. Ham, 986 F.2d 1428 (10th Cir. 1993) (unpublished decision) ("[Plaintiff's] assertion that 28 C.F.R. § 541.22 grants him a liberty interest in remaining in general prison population is not supported by the law of this jurisdiction."); Awalt v. Whalen, 809 F. Supp. 414, 416 (E.D. Va. 1992) ("[Sections 541.22 and 541.23] do not create a liberty interest in release from detention which a hearing would protect.").

[9]Telier v. Fields, 280 F.3d 69 (2d Cir. 2000); Muhammad v. Carlson, 845 F.2d 175, 177-78 (8th Cir. 1988) (stating in dicta, prior to Sandin, that § 541.22-23 is "couched in 'unmistakably mandatory' language," and intimating that it would therefore give rise to a protectable liberty interest); Maclean v. Secor, 876 F. Supp. 695, 701-02 (E.D. Pa. 1995) ("[Sections 541.22 and 541.15] are sufficient to confer a liberty interest here. . . .").

[10]Telier v. Fields, 280 F.3d 69, 81 (2d Cir. 2000).

[11]Id.

[12]Id. at 75 (citing 28 CFR § 541.22 (c)(1) (emphasis added).

place the inmate in administrative housing is discretionary, the regulations gave a right to release from that status if the inmate met certain conditions. Because these release rules were mandatory the regulation met the test for the creation of a liberty interest.[13]

When the statute or regulation is not cloaked with mandatory language but instead grants prison officials discretion then there is no liberty interest created.[14] Furthermore, where the mere opportunity to get a benefit such as good time is provided, the loss of the opportunity due to discretionary administrative action does not create a liberty interest.[15]

If a state statute provides for preliminary procedures

---

[13] See also Reynolds v. Wolff, 916 F. Supp. 1018 (D. Nev. 1996) (holding that a good time statute which provided that an inmate earned good time unless he committed a serious offense created a liberty interest).

[14] See, e.g., Abed v. Armstrong, 209 F.3d 63 (2d Cir. 2000), cert. denied, 531 U.S. 897, 121 S. Ct. 229, 148 L. Ed. 2d 164 (2000) (good time statute is precatory and therefore does not create a liberty interest); Smith v. Noonan, 992 F.2d 987 (9th Cir. 1993) (use of the word "may" in a statute addressing the criteria for placing an inmate in administrative segregation makes it permissive and does not reach the process issues); Gambino v. Gerlinski, 96 F. Supp. 2d 456 (M.D. Pa. 2000), aff'd, 216 F.3d 1075 (3d Cir. 2000) (holding that statute providing a prisoner with a right, if practicable, to some reasonable period of halfway house or home confinement); Ford v. Retter, 840 F. Supp. 489 (N.D. Ohio 1993) (administrative segregation did not violate due process where Ohio law gave jailers unfettered discretion and inmate received a letter explaining status and was provided weekly review); Allen v. City and County of Honolulu, 816 F. Supp. 1501 (D. Haw. 1993), judgment aff'd, 39 F.3d 936 (9th Cir. 1994) (wording of statute regarding segregation is permissive and, therefore, does not create a liberty interest in avoiding administrative segregation); Hall v. Zavaras, 916 F.2d 634 (Colo. Ct. App. 1996) (state statute provided that department of corrections officials had the discretion to grant meritorious good time credits).

[15] See, e.g., Luken v. Scott, 71 F.3d 192 (5th Cir. 1995) (holding that confining an inmate to administrative segregation where he will loss good time was not a liberty interest); Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995).

---



to be followed before the imposition of punishment, does a prisoner have a judicially enforceable liberty interest in having the procedures followed? Some courts have given a negative answer, reasoning that the liberty interest must be found in the substantive rights withdrawn and not the procedural guarantees.[16] This position, however, does not preclude a state court from ordering, as a matter of state law, that the prescribed procedures must be followed in a particular case.[17] In *Hewitt*, the Supreme Court seemingly endorsed this approach:

The creation of procedural guidelines to channel the decision making of prison officials is, in the view of many experts in the field, a salutary development. It would be ironic to hold that when a state embarks on such desirable experimentation it thereby opens the door to scrutiny by the federal courts, while states that choose not to adopt

---

[16] Lombardo v. Meachum, 548 F.2d 13 (1st Cir. 1977); Cofone v. Manson, 594 F.2d 934 (2d Cir. 1979); Bills v. Henderson, 631 F.2d 1287 (6th Cir. 1980). But see Jones v. Marquez, 526 F. Supp. 871 (D. Kan. 1981); King v. Hilton, 525 F. Supp. 1192 (D.N.J. 1981); McKinnon v. Patterson, 425 F. Supp. 383 (S.D. N.Y. 1976), judgment modified on other grounds, 568 F.2d 930 (2d Cir. 1977); Werlinger v. State, 117 Idaho 47, 785 P.2d 172 (Ct. App. 1990) (state regulations limiting the time for the warden's review of discipline did not create a protected liberty interest under the Fourteenth Amendment, state constitutional issues were not raised).

[17] See, e.g., McQueen v. Vincent, 53 A.D.2d 630, 384 N.Y.S.2d 475 (3d Dep't 1976); Bekins v. Oregon State Penitentiary, Corrections Division, 19 Or. App. 11, 526 P.2d 629 (1974); State ex rel. Meeks v. Gagnon, 95 Wis. 2d 115, 289 N.W.2d 357 (Ct. App. 1980). In Conti v. Dyer, 593 F. Supp. 696 (N.D. Cal. 1984), the court held that under the state constitution, due process was a liberty interest. The court then proceeded to require, again under state law, certain procedural protections before an inmate could be placed in administrative segregation: "(1) a hearing with advance written notice (except in case of a genuine emergency), (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, and (4) counsel substitute for an illiterate inmate or in a case with complex issues." *Id.* at 703. On the other hand, a federal court arguably lacks jurisdiction to require state prison officials to conform to state procedural rules. See Monahan v. Wolff, 585 F. Supp. 1198 (D. Nev. 1984).

§9:5     RIGHTS OF PRISONERS, THIRD EDITION

such procedural provisions entirely avoid the strictures of the Due Process Clause. The adoption of such procedural guidelines, without more, suggests that it is these restrictions alone, and not those federal courts might also impose under the Fourteenth Amendment, that the state chose to require.[18]

Carrying this analysis one step further, what if a state creates, in the same statute, both a liberty interest and procedural limitation regulating its loss? In *Arnett v Kennedy*,[19] a minority of the Supreme Court stated that "where the grant of a substantive right is inextricably intertwined with the limitations on the procedures which are to be employed in determining that right a litigant . . . must take the bitter with the sweet." Six justices rejected this position, however, reasoning that the contents of due process are to be defined by the Constitution. This latter view was subsequently followed in *Vitek v Jones*,[20] which, as we have seen, is a case involving the transfer of a prisoner to a mental hospital. The Court looked to the relevant state statute in reaching its conclusion that a liberty interest was implicated, but ignored the procedural protections afforded by the statute in determining what process was due.[21] The answer to that question, said the majority, is dictated by the Constitution.[22]

## Atypical and Significant Hardships Beyond the "Ordinary Incidents of Prison Life"

For due process to apply under this branch of the due

[18]*Id.* at 471.

[19]Arnett v. Kennedy, 416 U.S. 134, 153-54, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974).

[20]Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980).

[21]*Id.* at 1262.

[22]*Id.* See also Bills v. Henderson, 631 F.2d 1287 (6th Cir. 1980). See, generally, Note, Supreme Court Review, Fourteenth Amendment-Due Process for Prisoners in Commitment Proceedings, 71 J Crim L & Criminology 579 (1980).

DISCIPLINARY PROCEEDINGS     §9:5

process analysis, the sanction imposed must result in an "atypical and significant hardship on the inmate in relation to ordinary incidents of prison life."[23]

This is an additional finding that must be made before a court can determine that there is a state-created liberty interest for which due process protections must be provided. This new standard was first established by the *Sandin* court. The formulation had not existed in the prior decisions of the Court and was the majority's distillation of a new approach that lower courts must follow before imposing due process safeguards. The effect of this standard is that it will be more difficult to find an imperative for the imposition of federally imposed due process standards in prison disciplinary proceedings because it will require inmates to clear an additional hurdle. In addition, as noted in the discussion of the case, the Court did not define the term. As Justice Ginsburg noted, the Court's failure to do so "leave(s) consumers of the Court's work at sea, unable to fathom" what is required to make this finding.[24]

While the Court did not define what it meant when it used the phrase, in the course of the opinion it did give some indications. For example, the Court spoke disparagingly of cases in which the federal courts had become immersed in the "day-to-day management of prisons" by finding state-created liberty interests in such matters as participation in "shock programs," prison furloughs, receiving a tray lunch rather than a sack lunch, receiving a paperback dictionary, freedom from transfer to a smaller cell without electrical outlets, and not being place on a food loaf diet.[25] Deprivations of these kinds of items, the Court assumed, is part and parcel of the "ordinary incidents of prison life" which are immune from due process protections. Moreover,

[23]Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2299, 132 L. Ed. 2d 418 (1995).

[24]*Id.* at 2303 (Ginsburg, dissenting).

[25]*Id.* at 2299 (citing cases).

the Court dismissed *dicta* from earlier cases that confinement in solitary confinement per se was a grievous loss that implicated a liberty interest.[26] On the facts in the specific case before it the Court also found that the 30 days of confinement in solitary confinement that Conner experienced under conditions of confinement that were similar to administrative segregation and protective custody was not "in its duration or degree of restriction" an atypical and significant hardship.[27] Finally, the court held that since the conviction was later expunged, Conner had not presented a situation in which "the State's action will inevitably affect the duration of his sentence."[28]

Since the Court's decision in *Sandin* lower courts have struggled to give meaning to the term "atypical and significant hardship." The case law is not of one piece; there are variations in approach and in result among the various circuit courts of appeal. We will discuss this topic by examining how courts have approached the various sanctions that prison officials typically impose including disciplinary confinement, loss of good time, revocation of work release, privileges, and revocation of parole and probation. We also will look at some common issues that have arisen as courts work through problems caused by this new test.

## Disciplinary Confinement

Just as there is no per se rule that placement in solitary confinement or disciplinary segregation, without more, is an atypical and significant hardship, so, too, there is no per se rule that confinement in disciplinary housing can never be an atypical and significant hardship. In addition the courts have not yet come to rest on the issue of how long a sentence in disciplinary confinement is required before it will be

[26] *Id.* at 2300.
[27] *Id.* at 2300.
[28] *Id.* at 2300.

---



determined that the sentence imposes an atypical and significant hardship. Thus, the determination of whether or not placement in disciplinary confinement in a particular case creates an atypical and significant hardship involves an intensive factual analysis of each plaintiff's case.[29]

According to one commentator the courts have utilized a two-part test to make this determination. The first part is to examine the amount of time sentenced to the unit.[30] In that connection courts have found fairly lengthy stays in disciplinary confinement not to be atypical and significant hardship. One judge wrote that courts should impose a bright line test that sentences of over 180 days in disciplinary confinement constitute an atypical and significant hardship.[31] However, that position was rejected.[32]

Courts in the absence of a bright line test have issued a variety of opinions. Examples include cases in which 180 days, 191 days, 270 days, eleven months, and 18 months were not held by courts to be atypical and significant hardships.[33] The Second Circuit recently held that 305 days in disciplinary confinement did

[29] See, e.g., Colon v. Howard, 215 F.3d 227, 229 (2d Cir. 2000) (pointing out that many cases have been remanded to district courts so that there could be "amplification of the record and more refined fact-finding" on these issues). See also Donna P. Thomas, The Second Circuit Decisions Affecting Prisoner Civil Rights Litigation, 21 QLR 137, 142 (2001) ("Although ultimately a question of law, significant factual findings are needed to determine both the actual conditions to which the prisoner was subjected and the actual duration of confinement under those conditions.").

[30] Scott v. Albury, 156 F.3d 283 (2d Cir. 1998) (focusing on the sentence imposed not what might have been imposed); see also Colon v. Howard, 215 F.3d 227, 231 n.4 (2d Cir. 2000) (focusing on sentence of 305 days not potential sentence of 360 days).

[31] Colon v. Howard, 215 F.3d 227 (2d Cir. 2000).

[32] *Id.* at 235 (concurring opinion of Walker, J., and Sack, J.).

[33] Columbia Human Rights Law Review, A Jailhouse Lawyer's Manual, 624 (5th ed 2000) (citing Tulloch v. Coughlin, 1995 WL 780970 (W.D. N.Y. 1995) (180 days); Jones v. Kelly, 937 F. Supp. 200 (W.D. N.Y. 1996) (191 days); Carter v. Carriero, 905 F. Supp.

implicate a liberty interest.[34] However, one district court decision from Indiana held that three years was not an atypical and significant hardship. The case is an aberration.[35] Other courts have held that much shorter

[99] (W.D. N.Y. 1995) (270 days); Frazier v. Coughlin, 81 F.3d 313 (2d Cir. 1996) (eleven months); Vasquez v. Coughlin, 2 F. Supp. 2d 255 (N.D. N.Y. 1998) (18 months). See also Camacho v. Keane, 1996 WL 204483 (S.D. N.Y. 1996) (40 days keeplock not enough to violate a liberty interest). See also Collmar v. Wilkinson, 187 F.3d 635 (6th Cir. 1999) (30-day confinement in security control, fourteen days in disciplinary control and six to eight months in administrative control, was not of such a degree or duration to constitute an "atypical and significant hardship); Madison v. Parker, 104 F.3d 765 (5th Cir. 1997) (30 days of commissary restriction and 30 days of cell restriction not atypical and significant deprivation); Seltzer-Bey v. Delo, 66 F.3d 961 (8th Cir. 1995) (two days not a liberty interest); Jackson v. New York Dept. of Correctional Services, 994 F. Supp. 219 (S.D. N.Y. 1998) (keeplock for 13 days not a liberty interest); Evans v. Allen, 981 F. Supp. 1102 (N.D. Ill. 1997) (218 days in segregation not a liberty interest); Luis v. Coughlin, 935 F. Supp. 218 (W.D. N.Y. 1996) (33 days of keep-lock status not a liberty interest); Schevers v. State, 129 Idaho 573, 930 F.2d 603 (1996) (55 days not a liberty interest); Sandefur v. Lewis, 937 F. Supp. 890 (D. Ariz. 1996) (141 days did not impose an atypical and significant hardship); Terrell v. Godinez, 966 F. Supp. 679 (N.D. Ill. 1997) (60 days not a liberty interest); Husbands v. McClellan, 990 F. Supp. 214 (W.D. N.Y. 1998) (six month confinement in special housing unit not a liberty interest); Lewis v. Tennessee Dept. of Correction, 2001 WL 459089 (Tenn. Ct. App. 2001), appeal denied, (Sept. 13, 2001) (5 day punitive segregation and loss of privileges not atypical and significant hardship); Armstrong v. Tennessee Dept. of Correction, 2001 WL 618603 (Tenn. Ct. App. 2001), appeal denied, (Oct. 22, 2001) (10 days solitary confinement, and loss of sentence reduction time for those days not atypical and substantial hardship).

[34] Colon v. Howard, 215 F.3d 227 (2d Cir. 2000); Lee v. Coughlin, 26 F. Supp. 2d 615 (S.D. N.Y. 1998) (holding that 376 days in disciplinary segregation was an atypical and significant hardship).

[35] For another possible aberration see Ward v. McCaughtry, 234 F.3d 1275 (7th Cir. 2000) (where segregation is not imposed for a duration of time that exceeds the plaintiff's remaining term of incarceration, no liberty interest is implicated).

stays of 90 days constituted a hardship.[36]

The second part of the test looks at the conditions of confinement in the segregation unit. The goal is to determine the effect on the inmate and also to determine whether the conditions are "significantly more restrictive than those found in the general prison population."[37]

The two parts of the test are interrelated. The harsher the conditions in the unit the less time that must be served in it before it becomes an atypical and significant hardship.[38] By the same token somewhat less harsh conditions might become atypical if imposed for a long length of time. The key issue, as the Second Circuit explained, is to determine based upon a totality of the circumstances whether or not the plaintiff is "enduring a hardship that is substantially more grave than hardships they would be likely to endure simply as a consequence of the ordinary administration of the prison."[39] To make this determination it is important that a careful record be made of the actual conditions to which the plaintiff is exposed and the duration of time that the plaintiff will be held in the conditions and then compare that data with the conditions of confinement to which the plaintiff would have been exposed had he remained in the general population in that or a similar

[36] Compare Bonner v. Parke, 918 F. Supp. 1264 (N.D. Ind. 1996) (three years is not atypical and significant hardship) with Welch v. Bartlett, 196 F.3d 389 (2d Cir. 1999).

[37] Bonner v. Parke, 918 F. Supp. 1264, 1268 (N.D. Ind. 1996).

[38] See, e.g., Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."); Welch v. Bartlett, 196 F.3d 389, 392-93 (2d Cir. 1999). But see Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997) (holding that confinement in these conditions was not an atypical and significant hardship; "cells were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above").

[39] Welch v. Bartlett, 196 F.3d 389, 392 (2d Cir. 1999).

prison.[40]

A good example of this analysis is found in the Second Circuit's recent opinion in *Colon v. Howard*.[41] The plaintiff was sentenced to 305 days in a special housing unit for allegedly having contraband in his cell. At the district court level a full record was made as to the conditions in the special housing unit and those in the general population. The Second Circuit found that the conditions in the disciplinary unit "were the normal condition of SHU confinement in New York":

Colon was placed in a solitary confinement cell, kept in his cell for 23 hours a day, permitted to exercise in the prison yard for one hour a day, limited to two showers a week and denied various privileges available to the general population prisoners, such as the opportunity to work and obtain out-of-cell schooling. Visitors were permitted, but the frequency and the duration was less than in general population. The number of books allowed in the cell was also limited.[42]

The court held that while there are "no precise calipers to measure the severity" of the conditions the conditions endured for a sentence of 305 days were "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."[43]

The ruling is a sensible and realistic way to approach this subject. As was demonstrated earlier in this book, conditions in punitive segregation similar to those described in the *Colon* opinion come perilously close to running afoul of the Eighth Amendment's stricture on

[40]See Thomas v. Newkirk, 905 F. Supp. 580 (N.D. Ind. 1995).
[41]Colon v. Howard, 215 F.3d 227 (2d Cir. 2000).
[42]Id. at 229-30.
[43]Id. at 230-31. Subsequently the Second Circuit found that a sentence of 180 could be sufficient to establish a hardship under the Sandin guideline. Kalwasinski v. Morse, 201 F.3d 103 (2d Cir. 1999).

cruel and unusual punishment, if they do not actually.[44] Regardless, conditions such as those described in *Colon* impose a severe psychological impact on most people who are exposed to them.[45] The Second Circuit's conclusion therefore that this was an "atypical and significant hardship" is a straightforward acknowledgment of reality. For future cases the *Colon* court indicated the importance of presenting evidence "of the psychological effects of prolonged confinement in isolation."[46] The court also recommended that counsel be appointed for prisoners who did not have counsel so that an adequate record on these key points could be made.[47]

### Good Time

In *Sandin*, the Supreme Court indicated that statutory good time by which an inmate is entitled to time off his sentence conditioned on good behavior while in prison is an interest of "real substance."[48] Since the loss of good time will inevitably affect the duration of imprisonment its deprivation does seem to implicate a liberty interest.[49]

[44]For a discussion on the constitutionality of conditions on disciplinary segregation and "super max" units see § 2:2.
[45]In a real way, therefore, these conditions are comparable to the kinds of psychological impact that the Supreme Court has held to be sufficient of its own force to justify due process protections in Washington v. Harper, 494 U.S. 210, 110 S. Ct. 1028, 108 L. Ed. 2d 178 (1990) and Vitek v. Jones, 445 U.S. 480, 100 S. Ct. 1254, 63 L. Ed. 2d 552 (1980).
[46]Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000).
[47]Id. at 232.
[48]Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2297, 132 L. Ed. 2d 418 (1995).
[49]See, e.g., Hinebaugh v. Wiley, 137 F. Supp. 2d 69 (N.D. N.Y. 2001) (holding that the loss of good time credits implicated a liberty interest, and sufficiently challenged both the fact and duration of the inmate's sentence); Whitlock v. Johnson, 982 F. Supp. 615 (N.D. Ill. 1997), aff'd, 153 F.3d 380 (7th Cir. 1998). This is to be distinguished from the right to earn good time, which courts have held does not qualify as an atypical or significant hardship.

RIGHTS OF PRISONERS, THIRD EDITION

Moreover, the Supreme Court ruled that a legislative attempt to deprive inmates of earned good time credits ran afoul of the ex post facto prohibition of the Constitution.[50]

---

[49] See, e.g., Luken v. Scott, 71 F.3d 192 (5th Cir. 1995) (holding that denial of the opportunity to earn good time credits while incarcerated in administrative segregation was not atypical or significant hardship affording inmate due process protection); Abdul-Akbar v. Department of Corrections, 910 F. Supp. 986 (D. Del. 1995), judgment aff'd, 111 F.3d 125 (3d Cir. 1997) (no liberty in good time credits); Herring v. Singletary, 879 F. Supp. 1180 (N.D. Fla. 1995) (cancellation by state legislature of 1,540 days good time credits under a statute designed to end premature release of inmates due to prison overcrowding did not deprive inmate of due process because good time credits are not a property interest which mandates substantive due process); Coslett v. State, 697 So. 2d 61 (Ala. Crim. App. 1997) (court held that opportunity to earn good time credits in Alabama was a privilege; thus, the loss of inmate's ability to earn credits because he committed disciplinary infractions did not rise to the level of a liberty interest deprivation); State v. Mullins, 647 N.E.2d 676 (Ind. Ct. App. 3d Dist. 1995) (holding that depriving an inmate of good time credits for rules infractions does not rise to the level of a liberty interest); State v. Landgraf, 121 N.M. 445, 1996 -NMCA- 024, 913 P.2d 252 (Ct. App. 1996) (holding that while state statute gave prison officials the discretion to allocate good time credits to inmates, prison officials were under no duty to allocate inmate good time credits even though the lower court found that inmate had been a model prisoner). See also Sims v. Maddock, 2 Fed. Appx. 767 (9th Cir. 2001), cert. denied, 122 S. Ct. 137, 151 L. Ed. 2d 89 (U.S. 2001) (holding that inmate did not have a liberty interest at stake in the loss of 150 days of good time credit, where he was serving a life plus three-year sentence).

[50] In Lynce v. Mathis, 519 U.S. 433, 117 S. Ct. 891, 137 L. Ed. 2d 63 (1997), the Supreme Court considered whether a Florida statute, which retroactively canceled the award of good-time credits, violated the Ex Post Facto Clause of the Constitution. The plaintiff, a Florida state prisoner who was convicted of attempted murder, was granted early release by the Florida Department of Corrections after earning a sufficient number of good time credits. The early release was designed to alleviate prison overcrowding. Shortly thereafter, the Florida legislature passed a statute retroactively canceling the award of good time credits to prisoners convicted of murder or attempted murder. Consequently, the

---

DISCIPLINARY PROCEEDINGS

However, due to Edwards v. Balisok,[51] if this is the case an inmate will not be able to challenge the loss of good time in a normal civil rights suit, but instead will be required to first go to state court in an attempt to overturn the decision to deny the inmate good time credits. The plaintiff in Edwards was an inmate at the Washington State Penitentiary in Walla Walla. He was charged with and found guilty of four prison violations. His sentence included 10 days in isolation, 20 days in segregation, and deprivation of 30 days' good time credit he had previously earned toward his release. The plaintiff filed suit in district court claiming the disciplinary procedures employed by the hearing officer/defendant violated his Fourteenth Amendment due process rights. The district court dismissed the plaintiff's claim based on Heck v. Humphrey,[52] where the United States Supreme Court held that a § 1983 claim is not judicially cognizable if a judgment for a prisoner "would necessarily imply the invalidity of his conviction or sentence unless he can demonstrate the conviction or sentence has previously been invalidated."[53] The Ninth Circuit held that the action could go forward because the claim challenged solely the procedures employed in a disciplinary hearing and because the plaintiff did not seek restoration of his lost good time credits.

The Supreme Court reversed. It held that the Heck doctrine was applicable even though the plaintiff did not in so many words challenge the loss of his good time credits. This is so because on the face of the com-

---

plaintiff was rearrested and returned to prison. He filed a writ of habeas corpus claiming the statute violated the Ex Post Facto Clause of the Constitution. The court, in a majority opinion written by Justice Stevens, held that the operation of the statute disadvantaged the plaintiff by increasing his sentence and therefore was unconstitutional.

[51] Edwards v. Balisok, 520 U.S. 641, 117 S. Ct. 1584, 137 L. Ed. 2d 906 (1997).

[52] Heck v. Humphrey, 512 U.S. 477, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

[53] Id. at 487.

plaint it was clear that the plaintiff's challenge to the procedures, if successful, would necessarily imply the invalidity of the judgment. The court rejected plaintiff's contention that the district court could rule favorably on his claims without invalidating the loss of good time credits. The Court that if the plaintiff was successful in his federal action in proving that the proceedings were unconstitutional the deprivation of good time credits was necessarily invalid even if there was evidence in the record to support the result.[54]

### Work Release

There currently is no support for the notion that there is a liberty interest in admission to work release.[55] However, there is for removal. Removal of an inmate from work release is akin to revocation of parole or probation in that the inmate who has been allowed out into the free world to participate in a temporary release or work release program is ordered

[54] For a sampling of lower court decisions following *Edwards*, see, e.g., Clarke v. Stalder, 154 F.3d 186 (5th Cir. 1998) (holding that a suit for loss of good time credits could not be brought in federal court until that "conviction" had been reversed on direct appeal, expunged by executive order, or otherwise declared invalid in a state collateral proceeding or by the issuance of a federal writ of habeas corpus); Spellmon v. Collins, 970 S.W.2d 578 (Tex. App. Houston 14th Dist. 1998), reh'g overruled, (June 18, 1998) (holding that a finding in favor of plaintiff would restore lost good time credits was barred by *Edwards*).

[55] See, e.g., Lee v. Governor of State of N.Y., 87 F.3d 55 (2d Cir. 1996); Greenholtz v. Inmates of Nebraska Penal and Correctional Complex, 442 U.S. 1, 9, 99 S. Ct. 2100, 60 L. Ed. 2d 668 (1979) ("There is a crucial distinction between being deprived of a liberty one has . . . and being denied a conditional liberty that one desires"). There have been similar rulings for "shock" incarceration, programs that have extensive boot camp aspects and which can lead to a shortened length of incarceration. See, e.g., Klos v. Haskell, 48 F.3d 81 (2d Cir. 1995) (participation in "shock incarceration program" was not a liberty interest for purposes of due process).

146

to return to life entirely behind prison walls.[56] For these reasons, some courts have held that this is an atypical and significant hardship.[57] Some have disagreed. The First Circuit is one court that takes the view that work release revocation is not a denial of a liberty interest.[58]

### Administrative Segregation

In many prisons administrative segregation and protective custody bear many of the attributes of punitive disciplinary confinement. The difference often is not so much the conditions as the reasons why the inmates are placed in there. Be that as it may, courts are much less willing to find that placement in administrative segregation is an atypical and significant hardship.[59]

In one recent case, for example, inmates were sent to

[56] Parole obviously implicates liberty interests. See, e.g., Calhoun v. New York State Div. of Parole Officers, 999 F.2d 647 (2d Cir. 1993) (plaintiff was held five days beyond the maximum expiration date for his sentence without final parole hearing; this stated a violation because an inmate has a liberty interest in being released on his maximum expiration date).

[57] Friedl v. City of New York, 210 F.3d 79, 46 Fed. R. Serv. 3d 146 (2d Cir. 2000). See also Kim v. Hurston, 182 F.3d 113 (2d Cir. 1999); Rouchio v. Coughlin, 923 F. Supp. 360, 374-75 (E.D. N.Y. 1996) (holding that revocation of work release was a "revocation of conditional freedom").

[58] Dominique v. Weld, 73 F.3d 1156 (1st Cir. 1996) (holding that revocation of work release after four years is a significant deprivation but it is not "atypical").

[59] Rodgers v. Singletary, 142 F.3d 1252 (11th Cir. 1998) (holding that two-month confinement in administrative segregation was not deprivation of a liberty interest); Arce v. Walker, 139 F.3d 329 (2d Cir. 1998) (holding that confinement of inmate in 18-day administrative segregation where he was deprived of exercise and access to communal religious services did not constitute an "atypical and significant" hardship); Jones v. Baker, 155 F.3d 810, 1998 FED App. 287P (6th Cir. 1998) (holding that state inmate's approximately two and one-half years' confinement in administrative segregation did not rise to the level of "atypical and significant" hardship); Wycoff v. Nichols, 94 F.3d 1187 (8th Cir. 1996) (holding that inmate who spent 45 days in administrative segregation,

147

33

a form of administrative segregation know as "Security Threat Group Management Unit ("STGMU")," [59] Inmates were confined to this unit indefinitely. To be released they had to renounce their affiliation with groups that prison officials considered to be a security threat and they also had to complete a behavior modification program. Inmates were confined to their cells at all times except for five hours per week when they were allowed out of their cells. They were strip searched every time they exited or reentered their cells. They could only shave or shower every third day and were prohibited from corresponding with any other inmate. The Third Circuit held that these harsh conditions did not impose an atypical and significant hardship. [61]

This case seems misguided. If the conditions in administrative segregation are similar to those in disciplinary confinement, if few inmates are exposed to

___

prior to reversal of disciplinary sanctions, did not have a constitutionally protected liberty interest to be free from that confinement); Pichardo v. Kinker, 73 F.3d 612 (5th Cir. 1996); Amos v. Nelson, 260 Kan. 652, 923 P.2d 1014 (1996) (holding that administrative segregation, in which inmate's privileges and rights were restricted did not impose an atypical and significant hardship); Sandefur v. Lewis, 937 F. Supp. 890 (D. Ariz. 1996) (confinement of inmate in administrative segregation for 141 days did not impose an atypical and significant hardship); Christianson v. Clarke, 932 F. Supp. 1178 (D. Neb. 1996) (state inmate failed to allege facts sufficient to implicate a state created liberty interest protected by Due Process Clause resulting from his confinement in immediate segregation, administrative segregation or protective custody; inmate had not alleged any atypical and significant hardship that presented a dramatic departure from basic conditions expected of prison life, he did not allege that he faced possibility of losing good time credits or that his release date could be affected by administrative segregation, and he did not point to any state statute or prison regulation that may have created a liberty); Sorenson v. Murphy, 874 F. Supp. 461 (D. Mass. 1995) (de minimis punishment, such as administrative segregation until urine sample tested negative for barbiturates, and 12-day loss of visiting privileges did not rise to level of federal due process claim).

[59] Fraise v. Terhune, 283 F.3d 506 (3d Cir. 2002).

[61] Id. at 522-23.

148

the conditions in comparison to those sent to administrative segregation then it follows that just as is the case with punitive segregation, placement in administrative segregation is an atypical and significant hardship. *Shoats v. Horn* [62] is more in line with this notion. There, an inmate who was kept in administrative segregation in a form of "permanent solitary confinement" for a period of eight years was subjected to an atypical and significant hardship. [63]

Another instructive case is *Giano v. Kelly.* [64] There the district court held that confinement for almost two years to administrative segregation violated due process. The court held that regulations relating to administrative segregation were couched in mandatory language, required a substantive predicate for AS confinement and that inmates were denied virtually all meaningful contact with other inmates and had no access to structured activities such as job assignment, classroom instruction, group recreation, or religious observances. The evidence showed that for all practical purposes, the plaintiff's life was confined to a cell roughly ten feet by ten feet, except for an hour a day when he was confined to a cell approximately twice as large for "recreation." The court held that it would be clearly atypical for a general population inmate to be subjected to the deprivations which plaintiff endured.

## In Comparison to What?

We have seen that to qualify for due process protection the deprivation must cause an "atypical and significant hardship on the inmate in relation to ordinary incidents of prison life." The questions arises "atypical" in relation to what? Is it the most restrictive conditions

___

[62] See, e.g., Shoats v. Horn, 213 F.3d 140 (3d Cir. 2000).

[63] Id.

[64] Giano v. Kelly, 2000 WL 876855 (W.D. N.Y. 2000).

149

in the prison system?[65] Is it in comparison to other inmates in the same classification system?[66] Is it in comparison to the entire prison system or just the prison from which the plaintiff resides? Is it in comparison to the general population in the prison? There is no unanimity of response to these questions and there is support for virtually all of these positions. However, Judge Level, speaking for the Second Circuit, gave a compelling rationale for viewing the best comparison as one that looks for the baseline at conditions imposed on inmates in general population.[67] Anything that varies significantly from that qualifies as an "atypical" hardship. As Judge Level explained:

The theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as punishment for misbehavior, but simply as the result of ordinary prison administration.[68]

Other courts agree with this analysis.[69]

### Pretrial Detainees

The basic premise of *Sandin* is that inmates have a

[65]Hatch v. District of Columbia, 184 F.3d 846 (D.C. Cir. 1999); Bryan v. Duckworth, 88 F.3d 431 (7th Cir. 1996).

[66]McClary v. Kelly, 4 F Supp2d 195 (WD NY 1995).

[67]Welch v. Bartlett, 196 F.3d 389, 393 (2d Cir. 1999).

[68]*Id.*

[69]See, e.g., Hatch v. District of Columbia, 184 F.3d 846, 337 (D.C. Cir. 1999) (comparing conditions of inmate plaintiff's segregated confinement as he described them, with conditions faced by prisoners in the general population); Wagner v. Hanks, 128 F.3d 1173 (7th Cir. 1997) (holding that the standard for determining whether deprivation occurred was a comparison of conditions in disciplinary segregation with those in the state's entire general prison system; not just general conditions in inmate's prison). See also Alvarez v. Coughlin, 2001 WL 118598 (N.D. N.Y. 2001) (holding that it was error to compare special housing conditions to general prison population conditions statewide without comparison of the conditions at the institution in question).

smaller quantity of liberty interests than free world persons because prisoners have been convicted of a crime after having been given due process protections. They have as a result been deprived of their basic liberty "to the extent that the state may confine . . . and subject . . . [prisoners] to the rules of its prison system."[70] This rationale, of course, is not applicable to pretrial detainees who have not yet been convicted of a crime and who therefore have not lost their "freedom" in the sense that *Sandin* described. Pretrial detainees therefore should not be subjected to the atypical and significant hardship test.[71]

### Denial of Prison Privileges

Prisoners in the best of circumstances are subjected to a host of restrictions and indignities. By the same token, there are a multitude of prison conditions that define the quality of life in the institution for each prisoner. These conditions can be altered by the denial or deprivation of any number of "privileges" that are available to inmates. To the extent that these are the part of the sentence to which most inmates are subjected they do not constitute an atypical and significant hardship. Thus, for example, denial of one visit and an occasional meal was held not to constitute an unusual

[70]Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2297, 132 L. Ed. 2d 418 (1995) (citing Meachum v. Fano, 427 U.S. 215, 224-25, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976)).

[71]See, e.g., Mitchell v. Dupnik, 75 F.3d 517 (9th Cir. 1996); Zarnes v. Rhodes, 64 F.3d 285 (7th Cir. 1995); Mitchell v. Sheriff Dept, Lubbock County, Tex, 995 F.2d 60 (5th Cir. 1993) (plaintiff's allegation that jail regulations created a liberty interest in avoiding segregation was valid); Dean v. Thomas, 933 F. Supp. 600 (S.D. Miss. 1996) (placement of pretrial detainee in lockdown without hearing violated due process of law); Ramsey v. Squires, 879 F. Supp. 270 (W.D. N.Y. 1995), aff'd, 71 F.3d 405 (2d Cir. 1995) (holding that state regulations and procedures for confinement to administrative segregation provided pretrial detainee with a liberty interest). But see Cephas v. Truitt, 940 F. Supp. 674 (D. Del. 1996).

deprivation.[72] The same is true of a search policy.[73] A myriad of similar types of deprivations have been held not to qualify.[74]

[72] Berry v. Brady, 192 F.3d 504 (5th Cir. 1999).

[73] Mitchell v. Dupnik, 75 F.3d 517 (9th Cir. 1996).

[74] See, e.g., Sandin v. Conner, 515 U.S. 472, 115 S. Ct. 2293, 2299, 132 L. Ed. 2d 418 (1995) (noting that shock incarceration, tray lunches rather than box lunches, access to in cell television were not liberty interests); Jamal v. Cuomo, 234 F.3d 1273 (7th Cir. 2000), cert. denied, 532 U.S. 963, 121 S. Ct. 1498, 149 L. Ed. 2d 383 (2001) (holding that there was no liberty interest in employment or housing status, therefore, inmate's due process rights were not violated); Duffy v. Riveland, 98 F.3d 447, 17 A.D.D. 1006 (9th Cir. 1996) (classification decisions); Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995) (prison officials did not violate due process where they terminated inmate's prison job; court noted that inmate had no liberty interest in prison employment); Waite v. Mulvey, 2000 WL 33170996 (Mass. Super. Ct. 2000) (inmate's sanction of 9 weeks loss of television and radio privileges did not implicate a liberty interest, therefore no due process was required); Watson v. Smith, F.Supp.2d 2001 LEXIS 2372 (W.D.Mich. February 5, 2001) (30 days loss of privileges did not deprive inmate of a liberty interest, therefore, even if the disciplinary hearing decision was erroneous, the inmate's due process rights were not violated); Lawson v. Scibana, 2000 WL 356379 (E.D. Mich. 2000) (staying in "preferred housing" not a protected liberty interest); Nicholas v. Riley, 874 F. Supp. 10 (D.D.C. 1995), aff'd, 1995 WL 686227 (D.C. Cir. 1996), reh'g and suggestion for reh'g in banc denied, (Dec. 7, 1995) (denial of Pell Grants for educational purposes did not trigger procedural due process claim); Temple v. Dahm, 905 F. Supp. 670 (D. Neb. 1995) (inmate had no liberty interest in viewing television in prison or in obtaining a prison educational interest; Wilson v. Harper, 949 F. Supp. 714 (S.D. Iowa 1996) (inmate's displacement from "honor lifer" to stricter conditions of punitive confinement after disciplinary action did not implicate a liberty interest; honor lifer status conferred greater benefits in relation to other prison classifications; this included: increased recreational time, exercise, telephone privileges, shower privileges, and possession of personal items).

In one unusual case, Ort v. White, 813 F.2d 318 (11th Cir. 1987), the court held that a disciplinary denial of water to a prisoner on a farm detail until the prisoner performed a required task did not implicate either an Eighth Amendment or Fourteenth Amendment due process violation. The uncooperative prisoner had

## Property Interests

Sandin deals with liberty interests, not property interests. Property interests, of course, are also protected by the Due Process Clause.[75] The doctrine established in Sandin, therefore, should not be applicable to situations in which an inmate claims an unconstitutional deprivation of property.[76] Nevertheless, a number of courts have proceeded on the assumption that property claims are also governed by the Sandin doctrine.[77]

the "Keys to the water jug in his pocket," the court said. "He could have a drink as soon as he decided to work."

[74] ". . . nor shall any State deprive any person of life, liberty, or property without due process of law;" U.S. Const. amend. XIV § 1.

[76] See, e.g., Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995); Wenzler v. Warden of G.R.C.C., 949 F. Supp. 399 (E.D. Va. 1996); Mathis v. State, 545 N.W.2d 548 (Iowa 1996) (inmate had a due process right to a hearing to contest department of corrections $1,500 assessment, the amount not covered by guard's workman's compensation, after inmate struck a prison guard with a closed fist causing injury to guard's face). But see Pryor-El v. Kelly, 892 F. Supp. 261 (D.D.C. 1995) (applying Sandin to property deprivations).

[77] In Cosco v. Uphoff, 195 F.3d 1221 (10th Cir. 1999), cert. denied, 531 U.S. 1081, 121 S. Ct. 784, 148 L. Ed. 2d 680 (2001), inmates, while incarcerated, had acquired personal property, including "hobby" and legal materials, which they kept in their cells. Shortly after the murder of a corrections officer, the prison authorities adopted a policy that limited the amount of property prisoners could keep in their cells. The new policy provided for storage of unauthorized materials for 90 days and gave inmates the opportunity to ship their property to an alternative off-prison location of their choice. As a result of the new policy, prison officials removed property from the inmate's cells. The new regulations did not present the type of atypical, significant deprivation of their existing cell property privileges in which a state might create a property interest protected by due process, even though prisoners also claimed an interest in income from hobbies. See also Pryor-El v. Kelly, 892 F. Supp. 261 (D.D.C. 1995) (prison officials did not violate due process where they removed and sent home property from inmate's cell that exceeded prison regulations; court noted that inmate still retained control over the property, decision

maximum term of incarceration and reduce the maximum term of parole supervision. Where the inmate is serving a state prison sentence, earned good time deductions also reduce the minimum term of incarceration.

**\*12067** (b) <u>Statutory Good Time</u>. Statutory good time refers to the reduction of a maximum term of imprisonment as authorized by state law and as calculated by the custodial authorities pursuant to M.G.L. c. 127, § 1 29. Sentences for offenses committed on or after July 1, 1994 do not receive statutory good time credits.

<u>Governor's Pardon/Commutation Guidelines</u>. General policy statements published periodically by the Governor to assist the Advisory Board of Pardons during consideration of petitions for pardon and commutation.

<u>Habitual Criminal</u>. A defendant, having two previous convictions and having received terms of not less than three years each and who does not show that he has been pardoned for either crime on the ground that he was innocent, may be sentenced by the court as a "habitual criminal" upon conviction of a third felony. M.G.L. c. 279, § 25. Such statute requires that a sentence imposed upon a defendant after being found a "habitual criminal" be the maximum state prison term allowed by law for the crime of which the defendant was found guilty.

<u>Hearing Panel</u>. Members of the Parole Board or Hearing Examiners who conduct parole release, rescission, or preliminary or final revocation hearings.

<u>House of Correction Sentence</u>. As authorized by M.G.L. c. 279, §§ 6 and 15, a sentence to a house of correction contains a maximum term of 2 1/2 years for any one offense. Parole eligibility for a house of correction sentence is set by Massachusetts Parole Board regulation as provided by 120 CMR 200.01(1).

<u>Institutional Parole Officer</u>. A staff member of the Massachusetts Parole Board whose work location is a county or state correctional facility. Institutional parole officers prepare inmates for

their parole hearings, assist inmates in formulating plans for parole, and facilitate the decision making process of the parole hearing panel by compiling information for parole hearings.

<u>Intelligence Information</u>. Records and data compiled by a criminal justice agency for the purposes of criminal investigations, including reports of informants, investigators, or other persons of any type of surveillance associated with an identifiable individual. Intelligence information shall also include records and data compiled by a criminal justice agency for the purposes of investigating a substantial threat to an individual, or to the order or security of a correctional facility. Such information is not included in the definition of CORI. M.G.L. c. 6, § 167.

**\*12068** <u>Intervening Sentence</u>. A new sentence which interrupts the service of a prior existing sentence.

<u>Maximum Term of Sentence</u>. The maximum period of time that an inmate may be held in a custodial facility or under supervision on a sentence or sentences.

<u>Mittimus</u>. A document signed by an officer of the court which memorializes the terms and duration of any sentence of imprisonment imposed on the defendant by the court and authorizes the transfer of that defendant from the custody of the sentencing court to a correctional institution in the Commonwealth.

<u>Pardon</u>. The modification or cancellation of the fact or effect of a criminal conviction by the Governor upon recommendation of the Advisory Board of Pardons, with the advice and consent of the Executive Council. M.G.L. c. 127, § 152 et seq.

(a) <u>Unconditional Pardon</u>. An unqualified grant of pardon conferring to the recipient those entitlements and rights enjoyed by persons having no record of Massachusetts criminal convictions.

(b) <u>Conditional Pardon</u>. A qualified pardon

Copyright (c) West Group 2002 No claim to original U.S. Govt. works



CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the above TREATISE'S on the Respondent's counsel, DAVID M. LIEBER, by first class pre-paid mail at the following address: ATTORNEY GENERAL'S OFFICE, ONE ASHBURTON PLACE, BOSTON, MA. 02108, on this 29th day of October in the year 2004. Signed under the penalties of perjury.

CHARLES RAMPINO